130 N.J. Super. 63 (1974)
324 A.2d 914
THE STATE OF NEW JERSEY, PLAINTIFF,
v.
RONALD RICHARDSON, DEFENDANT.
Superior Court of New Jersey, Law Division  (Criminal).
June 10, 1974.
*65 Mr. Stanley C. Van Ness, Public Defender, for defendant (Mr. Michael L. Perlin, Deputy Public Defender, of counsel and on the brief).
Mr. Wilbur H. Mathesius, Special Deputy Attorney General in charge of Mercer County Prosecutor's Office, for plaintiff (Mr. Paul T. Koenig, Special Deputy Attorney General, of counsel and on the brief).
*66 SALVATORE, J.S.C.
Defendant was convicted of robbery, N.J.S.A. 2A:141-1, and was sentenced by this court on April 14, 1972 to New Jersey State Prison for a maximum term of eight years and a minimum term of five years. On May 31, 1972 defendant filed an appeal to the Appellate Division of the Superior Court. His conviction was affirmed on November 16, 1973. Defendant then filed a motion for reconsideration of sentence pursuant to R. 3:21-10(a) on January 3, 1974.
At the hearing on the motion defendant testified that he had been attending religious services and meetings within the prison conducted by Jehovah's Witnesses since April 1972. In June 1972 he was converted to the Jehovah's Witnesses sect and since then has become a devout member of that religion. The membership in this religious organization has grown from three inmates when defendant first began attending the meetings, to a present active membership of 24. The defendant's religious fervor became instrumental in the conversion of several members of the prison community to the teachings of Witnesses, by "making calls on them" and bringing them "the message" of his religion. Defendant testified one of the basic tenets of his faith is that all Witnesses "must preach the good news to all the world; all four corners of the earth."
By this motion for a reconsideration of sentence defendant does not seek the usual relief available under R. 3:21-10(a). He testified that he "wasn't seeking relief to that extent, not for a reduction of sentence." He requested that the court "let the sentence stay." He believed that had he requested the normal reduction of sentence, he "would be looking out for myself." Thus, it is defendant's desire to help the "total (religious) organization" which has prompted him to request an unusual type of relief.
Instead of a reduction of sentence defendant requests that this court grant him a release from the State Prison one weekend a month "to participate most actively with the rest *67 of the Jehovah's Witnesses out there." His activities in the community would include attendance at religious services at the Kingdom Hall, going from door to door, bringing the good news and "(e)verything the Witnesses do in the field." Most important to defendant is that he be given the opportunity to attend ministry schools and services in the community so that he "could become more enlightened" and "could enlighten the brothers that have been converted here in the prison as to the organization out there." Defendant testified he would restrict his activities to the Trenton, Hopewell or Princeton communities and abide by any restrictions which the court seeks to place on his mobility. He would plan to live with his parents during the weekend releases.
Defendant testified that other inmates who belong to other religious sects have been released for religious purposes. He testified that inmate Edward McDowney, a Seventh Day Adventist, has been released every Saturday, unescorted, to attend church services in Trenton.
Miss Lilian J. Lucier, Coordinator of the Community Release Program at State Prison, testified that through the program prisoners who are classified as "minimum custody" are permitted to attend religious functions outside the institution, and approximately ten prisoners each month are permitted to leave to attend church services or other religious programs. While the same inmate might be released more than once, no inmate is released on a "regular basis." An inmate is released "never more than once a month" and "usually never even once every third month or something." Miss Lucier refuted Richardson's testimony concerning inmate McDowney. She testified that McDowney had applied for and been granted a release to attend church services on December 22, 1973. However, McDowney is not granted a release every week, as defendant indicated. During the two years that Miss Lucier has been assigned to the State Prison, only one inmate had been released on more than three occasions, for reasons involving family problems and religious *68 functions. Inmates whose applications are approved are never granted a release for more than ten hours and are always escorted during that period.
The court finds no substance in defendant's contention that he was denied his rights under the free exercise clause of the First Amendment, grounded in the argument that any denial of the opportunity to attend religious functions outside the prison on a monthly basis prohibits him from practicing the most important tenet of his faith. In its resolution of this issue the court is governed by the principle that a prisoner retains the constitutionally protected rights of an ordinary citizen except to the extent that their withdrawal or limitation may be justified by the considerations underlying our penal system. Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948); Jackson v. Godwin, 400 F.2d 529, 532 (5 Cir.1968); Smith v. Robbins, 328 F. Supp. 162 (S.D. Me. 1971); Sostre v. McGinnis, 442 F.2d 178, 188 (2 Cir.1971). The confinement of defendant in this instance resulted in a justifiable restraint imposed by the State on his freedom to exercise his belief in the necessity to "preach the good news" to the community outside the prison walls and is a permissible infringement upon defendant's First Amendment rights. In Cantwell v. State of Conn., 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1939), the Supreme Court distinguished between the freedom to believe and the freedom to exercise one's belief embodied in the free exercise clause of the First Amendment:
* * * the Amendment embraces two concepts,  freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.
In the instant matter defendant's conviction and sentence and resulting interests of society in his lawful incarceration may be held paramount to his right to exercise his chosen form of religion.
*69 Defendant's assertion that the equal protection clause of the Fourteenth Amendment demands that he be afforded weekend releases is without merit. After a review of the testimony this court finds that no prisoners incarcerated at State Prison have ever been granted relief to the extent requested by defendant. The testimony reveals only a few specific instances in which prisoners classified as "minimum" security have been released to attend religious functions outside the prison. The distinction between defendant and those who have been granted release to attend religious functions outside does not bear upon defendant's "fundamental" interest under the free exercise clause of the First Amendment. It is a distinction based upon a prisoner's classification as either a "maximum" or "minimum" security inmate and not upon the inmate's religious affiliation.
Defendant further claims "there is not a shred of substantive evidence" that his classification as "maximum" security is justified. However, consideration of this argument is not within the province of this court through a motion for post-conviction relief. A determination as to which inmates shall be classified as "minimum" security and thus become eligible for various privileges is a matter within the discretion of the prison officials. State v. Rydzewski, 112 N.J. Super. 517, 521 (App. Div. 1970).
A person challenging the actions or decisions of a state administrative agency or officer should seek judicial review as a matter of right before the Appellate Division pursuant to R. 2:2-3(a). State v. Rydzewski, supra at 520.
After a thorough review of the record in this matter this court finds no basis for granting defendant's unusual request for weekend releases to attend religious functions outside the prison. Such relief is a matter for the administrators of the Community Release Program, and is more properly left to that agency.
According to defendant's testimony, Jehovah's Witnesses have had great difficulty in locating a suitable meeting place *70 or Kingdom Hall within the State Prison. He testified he has written to various prison officials in an attempt to direct their attention to the problems of the Witnesses who were "being tossed from room to room" over the past two years in an effort to locate a place to pray and conduct religious meetings. Defendant stated that one official, Albert Gray, Superintendent of the State Prison, indicated to him that he was not even aware there was any such sect as Jehovah's Witnesses in the prison. Defendant attributes the difficulties his religion has experienced in the prison partly to "militant" and "political" organizations within the prison which are allowed "to dictate whether or not we are to have our prayers, our Kingdom Hall." He alleged that the prison officers had no control over these organizations. Defendant testified that Muslims in the prison, with a membership of approximately 35, have extensive facilities for meeting and study:
* * * they have, surprising enough, everything. They have five rooms for Islam, the University of Islam. They have an auditorium. They have 5 rooms in the school. They have the office in the school. They have an auditorium, the big auditorium. We can't have anything.
The State did not adduce any testimony to the contrary. The court recognizes that prison officials must be accorded latitude in the administration of prison rules and regulations. However, this court directs the prison officials to be mindful of their responsibility to protect defendant's rights, within the prison setting, guaranteed under the First and Fourteenth Amendments. "When the state seeks to jusify the granting or withholding of benefits and privileges based on religious classifications, the Equal Protection Clause of the Fourteenth Amendment demands that the state present a compelling interest which is served by the discrimination." Remmers v. Brewer, 361 F. Supp. 537, 542 (S.D. Iowa 1973). This principle must also be applied to the prison community. Walker v. Blackwell, 411 F.2d 23 (5 Cir.1969).
*71 The State has not presented any compelling state interest in denying the same privileges of access to devotional facilities which are enjoyed by the Muslims or other religious organizations within the prison community. The disparity in the extent of the facilities afforded the Jehovah's Witnesses sect, which has 24 active members, and the Muslims with a membership of approximately 35, is based purely upon a religious classification.
The officials at the State Prison must recognize the Jehovah's Witnesses sect as a religion within the ambit of the First Amendment. In Remmers v. Brewer, supra, the court set down limitations on the discretion of the prison officials in determining which religions will be recognized for the purposes of affording the rights of assembly and worship in prison:
Moreover, the state's argument suggests that prison administrators have the power to decide which religions are "recognized" and legitimate and which are not. Such a notion strikes directly at the freedom from governmental approval of secular religion which is at the core of the First Amendment's Establishment Clause. [361 F. Supp. at 541]
Accordingly, defendant must be afforded a reasonable opportunity of pursuing his faith substantially comparable to the opportunity afforded the members of the Muslim religion or other religions. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The United States District Court's holding in Remmers v. Brewer, supra, is particularly instructive as to the guidelines which the prison officials must follow:
Plaintiffs must be allowed the same rights of assembly, discussion, correspondence, ministerial visits, devotional facilities, etc. which are enjoyed by Protestant and Catholic inmates * * *. Of course the privileges allowed Church of the New Song devotees need only be substantially, not literally, equivalent. Prison authorities may properly take into account distinguishing factors such as the size of the group in providing facilities. Church of the New Song members are also subject to the same lawful orders and regulations concerning the *72 internal affairs of the prison as other inmates. What is demanded is that Eclatarians be allowed a fair and meaningful opportunity to freely exercise their religion in the same degree as other inmates, Protestant and Catholic. [361 F. Supp. at 542; emphasis supplied]
By the implementation of these basic guidelines defendant and members of his sect may be assured that the practice of their religion within the prison need not be subject to the whim of the prison officials, nor to the dictates of the more conventional religious groups. The opportunity for defendant to conduct religious meetings will not be limited to the prison hallways.