859 F.2d 1211
 57 USLW 2328, RICO Bus.Disp.Guide 7082,
3 Indiv.Empl.Rts.Cas. 1679
 Robert L. Randolph CULLOM, Plaintiff-Appellant,
v.
HIBERNIA NATIONAL BANK, New Orleans, Louisiana, Hibernia
National Bank in Lafayette (Formerly Southwest
National Bank of Lafayette), Defendants-
Appellees.
 No. 87-3675.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 28, 1988.
 
 Peter J. Butler, Aubrey B. Hirsch, Jr., New Orleans, La., for plaintiff-appellant.
 William R. Forrester, Jr., New Orleans, La., Scott B. Schreiber, Joseph G. Poluka, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before POLITZ, KING and SMITH, Circuit Judges.
 KING, Circuit Judge:
 
 
 1
 This case involves the civil remedies provision of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. Sec. 1964 (1984), and the standing requirement that Sec. 1964(c) places upon a plaintiff. Essentially, Sec. 1964(c) requires that a plaintiff's injury must be "by reason of" a violation of Sec. 1962 of RICO. We hold that an employee discharged for refusing to participate in an illegal activity under RICO lacks standing to sue under Sec. 1964(c). The employee's injury was not "by reason of" or did not "flow from" the commission of the predicate acts on which the alleged RICO violation was based. Accordingly, we affirm the district court's dismissal of the case.
 
 I.
 
 2
 Since all facts alleged by the appellant are considered true on a review of a dismissal on a rule 12(b)(6) motion, Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); National Enters. v. Mellon Fin. Servs. Corp., 847 F.2d 251, 252 (5th Cir.1988), we set forth the facts alleged by the appellant. In the summer of 1984, Robert Cullom ("Cullom"), the plaintiff-appellant, became associated with Southwest National Bank of Lafayette ("SNB") and was elected as its president and chief executive officer as well as a member of SNB's board of directors. During this time and at all times relevant to this appeal, SNB was a wholly owned subsidiary of Southwest Bancshares, Inc. ("Southwest Bancshares"). Beginning in the early summer of 1985, Southwest Bancshares, SNB, and Hibernia Corporation, the parent company of Hibernia National Bank ("Hibernia") and of Guaranty Bank & Trust Company of Alexandria ("Guaranty Bank & Trust"), engaged in merger discussions; the object of these discussions was the acquisition by Hibernia Corporation of all of SNB's outstanding stock.[1]
 
 
 3
 Cullom alleges that in March of 1986, SNB, Hibernia, Hibernia Corporation, and Guaranty Bank & Trust created a "fraudulent scheme" which the parties intended to conduct over various reporting periods[2] for an indefinite period of time. The scheme consisted of Hibernia's sale and attempt to sell to other banks substantial short term participations in its loan portfolio.[3] Hibernia would sell these loan participations shortly before the end of a reporting period and repurchase them shortly after the end of the same reporting period. Thus, Hibernia reduced its loan portfolio while increasing its cash position, with the net result that Hibernia favorably distorted both its loan loss reserve size and its liquidity position. As a result of this scheme, the financial condition of Hibernia, Hibernia Corporation,[4] and the banks which purchased the short term loan participations would be materially distorted. Further, the Comptroller of the Currency ("Comptroller") specifically prohibits such practice.[5] Cullom was aware of the fraudulent effects that such a practice has on financial statements, and he also knew that the Comptroller prohibited such activity.
 
 
 4
 In March of 1986, Hibernia informed Cullom that it intended to sell one hundred fifteen million dollars in temporary loan participations. These loan participations were to be sold immediately prior to March 31, 1986, and repurchased immediately thereafter. Hibernia requested SNB to purchase ten million dollars of the one hundred fifteen million dollars of temporary loan participations. Because Cullom was suspicious of such a transaction, he contacted SNB's legal counsel and asked for advice concerning Hibernia's request. SNB's legal counsel refused to render an opinion on the matter. Thereafter, Hibernia mailed a letter to one of SNB's officers which confirmed Hibernia's earlier intention to delete several million dollars from its loan portfolio with SNB's participation. Concerned that Hibernia was asking SNB and Cullom to become involved in illegal activity, Cullom sought the advice of independent legal counsel. The independent legal counsel advised Cullom to do nothing concerning the proposed transaction without first obtaining an opinion from SNB's attorney.
 
 
 5
 Cullom ultimately refused to participate in the scheme, but on March 26, 1986, the SNB loan committee voted, over Cullom's objection, to purchase the temporary loan participations from Hibernia. Several hours later, however, SNB reversed its decision to purchase the temporary loan participations. Approximately one or two days after the loan committee meeting, Cullom met with Joseph Onebane ("Onebane"), a member of SNB's legal counsel and a member of SNB's board of directors. Onebane advised Cullom "not to make waves" with Hibernia and to throw away the circulars and written communications from Hibernia. Thereafter, around April 10, 1986, Cullom was re-elected to serve as SNB's president and chief executive officer for approximately one year and to serve another term on SNB's board of directors. On April 30, 1986, however, SNB informed Cullom that since Cullom's philosophy in operating a bank was different than Hibernia's philosophy, Cullom must resign or be fired. When Cullom asked for the real reasons behind his requested resignation, he was told that he was being asked to resign because he refused to participate and cooperate in the purchase of the loan participations from Hibernia and because he sought the advice of independent legal counsel. Cullom's request for a short period of time to make a decision was refused, and accordingly, he immediately submitted his resignation.
 
 
 6
 Cullom filed suit against Hibernia and SNB in April of 1987, alleging that Hibernia and SNB engaged in or conspired to engage in several counts of mail and securities fraud. Cullom further alleged that he was constructively discharged because he refused to participate in illegal activity, that he suffered damages due to his constructive discharge, and that because of his constructive discharge and his damages, he had standing to sue under RICO and should be afforded treble damages. On June 9, 1987, Hibernia and SNB filed a motion to dismiss, pursuant to Rule 12(b)(6), for a lack of standing and for a failure to state a claim upon which relief can be granted. Hibernia and SNB argued that since Cullom was not injured "by reason of" the predicate acts--the mail and securities fraud--Cullom did not have a RICO claim. The district court agreed; on August 5, 1987, the district court issued an Order and Reasons in support of its decision, Cullom v. Hibernia Nat'l Bank, 666 F.Supp. 88 (E.D.La.1987), and it granted Hibernia's and SNB's motion to dismiss. On August 7, 1987, the district court issued a judgment in favor of Hibernia and SNB and dismissed Cullom's suit. Thereafter, Cullom filed timely notice of appeal.
 
 
 7
 On appeal, Cullom argues that he has standing to sue under RICO for his damages because, unlike the cases in which an employee reports the RICO violation and is discharged, Cullom actually refused to participate in a scheme which violates RICO. Thus, the sole issue on appeal is whether a person may collect treble damages under the civil damage section of RICO, 18 U.S.C. Sec. 1964(c), when he refuses to participate in an activity which is violative of RICO and is constructively discharged for such a refusal. We hold that such a person does not have standing to sue under RICO for his discharge.
 
 II.
 
 8
 As previously mentioned, we consider all facts alleged by Cullom to be true. Cruz, 405 U.S. at 322, 92 S.Ct. at 1081; National Enters., 847 F.2d at 252. Further, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957) (footnote omitted).
 
 
 9
 As part of RICO's far-reaching civil enforcement scheme, Congress included Sec. 1964(c) which allows private suits and compensates injuries by awarding treble damages and attorney's fees. Sedima v. Imrex Co., 473 U.S. 479, 483, 105 S.Ct. 3275, 3278, 87 L.Ed.2d 346 (1985). Section 1964(c) states that "[a]ny person injured in his business or property by reason of a violation of section 1962[6] of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. Sec. 1964(c). The language "by reason of" in Sec. 1964(c) imposes a proximate causation requirement on plaintiffs. Haroco, Inc. v. American Nat'l Bank & Trust Co., 747 F.2d 384, 398 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); Sperber v. Boesky, 849 F.2d 60, 63 (2d Cir.1988). In interpreting this statutory causation requirement, we begin with the statutory language and the legislative history. As the Second Circuit in Sperber stated, "the language is general and there is little legislative history." Sperber, 849 F.2d at 63. In Sedima, however, the Supreme Court set out certain guidelines for applying and interpreting Sec. 1964(c), stating that Sec. 1964(c) was to be construed liberally.[7] Sedima, 473 U.S. at 492, 498, 105 S.Ct. at 3283, 3286. On the other hand, the Supreme Court placed a limit on the collection of private RICO damages when it interpreted the language "by reason of" in Sec. 1964(c). The Supreme Court began by stating that a person has standing to sue under Sec. 1964(c) only if the racketeering activities[8] forbidden by Sec. 1962 injure the person in his business or property. Specifically, the Court stated: "If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under Sec. 1964(c)." Id. at 495, 105 S.Ct. at 3284 (emphasis added). The Court explained:
 
 
 10
 [T]he plaintiff only has standing [under Sec. 1964(c)] if,[9] and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. As the Seventh Circuit has stated, '[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured.'
 
 
 11
 Id. at 496-97, 105 S.Ct. at 3285-86 (emphasis added) (quoting Haroco, Inc., 747 F.2d at 398 (emphasis added)). Finally, the Court stated that "the compensable injury necessarily is the harm caused by predicate acts," Sedima, 473 U.S. at 497, 105 S.Ct. at 3285 (emphasis added), and that "[a]ny recoverable damages occurring by reason of a violation of Sec. 1962(c) will flow from the commission of the predicate acts." Id. (emphasis added) (footnote omitted).
 
 
 12
 Although the language of Sedima is explicit in stating that the injury caused must flow from the predicate acts, Sedima 's facts are not particularly analogous to the present case. We find analogous, however, the circuit court cases which have dealt with persons who have reported RICO violations and were fired for such reporting (i.e., "whistle blowers"). Whistle blowers do not have standing to sue under RICO for the injury caused by the loss of their job. Pujol v. Shearson/Am. Express, Inc., 829 F.2d 1201 (1st Cir.1987); Nodine v. Textron, Inc., 819 F.2d 347 (1st Cir.1987); Morast v. Lance, 807 F.2d 926 (11th Cir.1987).
 
 
 13
 In Pujol, the plaintiff-appellant, Pujol, was a top executive at Shearson (Puerto Rico), and in his position, Pujol noticed serious deficiencies in the "internal controls" of both Shearson companies in Puerto Rico. Pujol notified top management of the situation, but he refused to sign an explanatory letter to clients because he felt that the letter did not represent a full disclosure of the situation. Pujol also notified Shearson executives that a number of banking transactions involving the misuse of funds had occurred. Pujol was instructed not to take any corrective action and not to report the irregularities to the appropriate authorities. At a meeting, Pujol submitted a letter to Shearson executives stating that Shearson's legal counsel should be consulted as to whether the internal audit's findings should be reported to the appropriate authorities. Pujol sent copies of the letter to Shearson's legal counsel and to other Shearson executives. Immediately after submitting the letter, Pujol was temporarily "suspended." Shearson changed the locks on Pujol's office door, seized and copied Pujol's personal files, revoked Pujol's American Express card, retained more than $35,000 in Pujol's account with Shearson, and accused Pujol of being directly involved in the irregularities discovered. Pujol, 829 F.2d at 1202-03.
 
 
 14
 In its opinion, the First Circuit noted that Pujol's complaint did not allege that he was injured by the predicate acts but rather "alleged that he was fired, slandered and otherwise injured because of the actions he took to report and to stop the illegal schemes." Id. at 1205. Further, the court held that Pujol alleged sufficient predicate acts--securities fraud and mail and wire fraud--but that "[t]he acts that injured Pujol ... were not caused by the 'predicate acts' alleged in the complaint within the meaning of Sedima 's causation requirement." Id.
 
 
 15
 Like Pujol, Cullom reported his concern and objections about the loan participation scheme to other executives within the company. Further, Onebane told Cullom "not to make waves" just as Pujol was told not to take any corrective action. Also, both Pujol and Cullom contacted their company's legal counsel about the legality of the alleged schemes. In addition, Cullom, like Pujol, does not allege that he was injured by the predicate acts--securities fraud and mail fraud. Instead, as Pujol alleges that he was injured because he reported the illegal scheme, Cullom alleges that he was injured because he refused to participate in a scheme that violated RICO. We agree with the First Circuit's reasoning; we hold that Cullom fails to allege a causal nexus between his injury and the predicate acts and that the acts which injured Cullom were not caused by the predicate acts that Cullom alleged in his complaint within the meaning of Sedima 's causation requirement. Thus, without the proper causal nexus, Cullom has no standing to sue under RICO.
 
 
 16
 Nodine v. Textron, Inc., 819 F.2d 347, is factually similar to Pujol[10] and lends support to our conclusion. In Nodine, the plaintiff-appellant, Nodine, was an area manager, and he discovered that his company was committing routine violations of Canadian customs laws. Nodine reported these violations to his superiors and to Textron's legal department. Also, Nodine signed a compliance letter stating that he knew of the Canadian customs violations, and when asked to change his statement, he refused to do so. Thereafter, Nodine was harassed at work, passed over for promotions and salary increases, and was finally discharged. Nodine, 819 F.2d at 347-48. The court in Nodine held that Nodine's injury was not a result of the alleged RICO violations--mail and wire fraud, obstruction of justice, obstruction of a criminal investigation,[11] and interference with commerce--but rather Nodine's "injury resulted from Textron's decision to fire him after he reported the customs scheme to his superiors." Id. at 349. We agree with Nodine and hold that Cullom's injury resulted from SNB's decision to fire him after he refused to participate in the alleged scheme and that neither Cullom's injury nor SNB's decision to fire Cullom resulted from the alleged predicate acts.
 
 
 17
 Cullom, however, argues that the factual distinction between reporting a RICO violation and refusing to participate in a RICO violation bears legal significance as well. Because we fail to see a significant legal distinction,[12] we reject Cullom's argument.
 
 
 18
 First, the present case is similar to Pujol and Nodine because Cullom, like Pujol and Nodine, reported his doubts concerning the legality of the scheme and his objections to the scheme to other persons with authority in the company. Thus, even though we view Pujol's and Nodine's actions ultimately as "reporting" and Cullom's actions ultimately as "not participating," the actions that each of the three chose to voice his concern about his company's activities are quite similar. Further, the policy reasons for allowing whistle blowers, as opposed to non-participants, to sue under RICO are more persuasive because in addition to exposing the illegal scheme to the public by bringing a private suit, the whistle blower often times exposes the illegal scheme to the authorities and cooperates with the authorities, thus "strengthening the legal tools in the evidence-gathering process." Organized Crime Control Act of 1970, Pub.L. No. 91-452, 1970 U.S.Code Cong. & Admin.News, 1073 (statement of findings and purpose).[13] However, being discharged for either reporting a RICO violation or refusing to participate in a RICO violation does not flow from the predicate acts; thus, both fail to meet the causal nexus required under the statutory language of Sec. 1964(c) and under Sedima.
 
 
 19
 Further supporting our view is Diamond v. Reynolds, No. 84-280 (D.Del. July 15, 1986) (Lexis, Genfed library, Dist. file), aff'd in part and rev'd in part and remanded on other grounds, 853 F.2d 917, cert. denied, --- U.S. ----, 109 S.Ct. 392, --- L.Ed.2d ---- (1988). The district court in Diamond granted the defendants' motion for summary judgment as to the plaintiff's RICO claim. The plaintiff argued that he was discharged because he refused to help carry out the racketeering acts of mail fraud. The Diamond court stated: "Thomas' discharge of plaintiff was completely severable from any racketeering acts defendants allegedly conducted. The discharge of plaintiff may have assisted defendant's alleged scheme, but the discharge in itself is not conduct constituting a violation of RICO." Id., slip op. at 6. While we refrain from making the strong assertion that Cullom's discharge was completely severable[15] from SNB's and Hibernia's illegal activity, we agree with Diamond 's holding and reiterate that Cullom's injury[16] does not flow from Hibernia's and SNB's alleged predicate acts within the meaning of the language in Sec. 1964(c) or in Sedima.
 
 
 20
 In addition to deciding that the plaintiffs' discharges did not flow from the predicate acts, both the Pujol court and the Diamond court noted that the plaintiffs were also not the targets or victims of the predicate acts. Pujol stated that Pujol was not a defrauded client or investor, Pujol, 829 F.2d at 1205, and Diamond said that "[t]he persons injured ... are the shareholders of Robertshaw." Diamond, No. 84-280, slip op. at 6. Just as the plaintiffs in Pujol and Diamond were not the victims of the predicate acts, Cullom in the present case is not the victim of the loan participation scheme. Indeed, Cullom states in his amended complaint that the victims of the loan participation scheme were the members of the general public who would rely on the periodic financial statements to make investment decisions concerning Hibernia Corporation. Therefore, by Cullom's own allegations, persons relying on the periodic financial statements to make investment decisions about Hibernia Corporation were the target of the predicate acts rather than Cullom.
 
 III.
 
 21
 As mandated by the language of the statute and of Sedima, we hold that a person who refuses to participate in an activity which is violative of RICO and is constructively discharged for such a refusal may not sue and collect treble damages under the private civil damage section of RICO, Sec. 1964(c). We AFFIRM the district court.
 
 
 
 [1]
 After the events concerning this appeal occurred, the discussed merger took place. Thereafter, SNB was known as Hibernia National Bank in Lafayette. For the purpose of this appeal, however, we will use the bank's former name and refer to it as SNB
 
 
 [2]
 SNB and Hibernia were national banks, and as national banks, they were required to make public and report their financial condition each quarter to the Comptroller of the Currency. Also, Hibernia Corporation, as a publicly traded corporation, was required to make public and to report its financial condition each quarter to the Securities and Exchange Commission
 
 
 [3]
 These short term participations in Hibernia's loan portfolio amounted to "temporary loan participations." A loan participation is a transaction in which two banks share the risk of loss, for a specified time and to a specified extent, on a loan made to a single borrower
 
 
 [4]
 Cullom asserts that Hibernia Corporation's financial condition would be affected because Hibernia is Hibernia Corporation's largest single asset
 
 
 [5]
 The office of the Comptroller sent a "banking circular" to the presidents of all national banks on August 7, 1984. This banking circular addressed and prohibited activities of "window dressing." From the letter, window dressing appears to include the loan participation scheme involved in this appeal
 
 
 [6]
 Sec. 1962 states:
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 18 U.S.C. Sec. 1962 (1984).
 
 
 [7]
 The Supreme Court stated that RICO should be read broadly because of "Congress' self-consciously expansive language and overall approach," Sedima v. Imrex Co., 473 U.S. 479, 498, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985) (citing United States v. Turkette, 452 U.S. 576, 586-87, 101 S.Ct. 2524, 2530-31, 69 L.Ed.2d 246 (1981)), and because of [Congress'] "express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.' " Id. (quoting Racketeer Influenced and Corrupt Organizations (RICO) Act of 1970, Pub.L. No. 91-452, Sec. 904(a), 84 Stat. 947)
 
 
 [8]
 18 U.S.C. Sec. 1961(1) (Supp.1988) defines "racketeering activity."
 
 
 [9]
 As the Supreme Court noted, RICO's proximate causation requirement is an aspect of standing. Thus, if Cullom fails to show that a causal nexus exists between his injury and the predicate acts, he has no standing to sue under Sec. 1964(c)
 
 
 [10]
 Morast v. Lance, 807 F.2d 926 (11th Cir.1987), is also factually similar to Pujol v. Shearson/Am. Express, Inc., 829 F.2d 1201 (1st Cir.1987), as well as to Nodine v. Textron, Inc., 819 F.2d 347 (1st Cir.1987). In Morast, the executive vice president, Morast, was fired for reporting a banking irregularity and for cooperating with a subsequent investigation. The Eleventh Circuit held that Morast's injury did not flow from the alleged predicate acts and that, therefore, Morast lacked standing to sue under Sec. 1964(c)
 
 
 [11]
 The Nodine court noted that the predicate act of obstruction of a criminal investigation came the closest to causing Nodine's injury. Nodine, however, waived this claim in the district court
 
 
 [12]
 Cullom cites Morast, see supra note 11, to bolster his argument that a legal distinction exists between reporting a RICO violation and refusing to participate in one. A careful reading of Morast, however, does not support such a distinction. First, Morast alleged that he was discharged because of a conspiracy and that "the only way defendants could continue their illegal scheme was to rid the bank of those people who would not 'go along' with the plan." Morast, 807 F.2d at 933. The Eleventh Circuit stated that "Morast was not fired because he refused to participate in the bank's illegal scheme[, and,] therefore, Morast's injury, his discharge, did not flow directly from the predicate acts, the defendant's banking violations." Id. (footnote omitted). We do not read these statements as Cullom does: reporters do not have standing to sue under RICO while non-participants do. Instead, given Morast's allegation that the bank had to rid itself of those who would not "go along" to continue its illegal scheme, we read this language as meaning that the only way the court could possibly find that Morast had standing was if he refused to participate in the scheme. Simply put, Morast's allegations did not "match" the facts of his case. This is not to say, however, that while those persons who report a RICO violation do not have standing, those persons who refuse to participate in a RICO violation do have standing
 Next, Cullom points to footnote eight on page 933 of Morast as a source of legal distinction between reporting a RICO violation and refusing to participate in a RICO violation. In footnote eight, the court stated: "Callan v. State Chemical Mfg. Co., 584 F.Supp. 619 (E.D.Pa.1984)[,] is inapposite because the plaintiffs in Callan, unlike Morast, were fired because they refused to participate in the illegal company policy." Id. at 933 n. 8. See Callan cited and discussed infra note 14. From this language, however, we cannot conclude that the Eleventh Circuit held or would hold that persons who refuse to participate in an illegal scheme, as opposed to those who report an illegal scheme, have standing to sue under RICO. Therefore, we are not persuaded by Cullom's reliance on Morast.
 
 
 [13]
 RICO is Title IX of the Organized Crime Control Act of 1970
 
 
 [14]
 Though we find Diamond persuasive, several other district courts have chosen a different outcome. See Acampora v. Boise Cascade Corp., 635 F.Supp. 66 (D.N.J.1986) (holding that plaintiff had standing to sue under RICO when plaintiff discovered illegal activity and, as a result of that discovery, was harassed and eventually caused to lose her job); Callan v. State Chem. Mfg. Co., 584 F.Supp. 619 (E.D.Pa.1984) (holding that plaintiffs had standing to sue under RICO when plaintiffs were discharged for refusing to participate in a commercial bribery scheme)
 Although we disagree with Acampora, we note that Acampora is factually different from the present case. The plaintiff in Acampora was eventually fired for discovering the illegal activities as opposed to being fired for refusing to participate in the illegal activities. We find, however, no legal distinction between being fired for "discovering" versus being fired for "refusing to participate" just as we find no legal distinction between "reporting" and "refusing to participate." Thus, we decline to endorse the holding of Acampora. Further, we note that Callan was decided before Sedima.
 
 
 [15]
 We note that a plaintiff could almost always make an argument that his injury was not completely severable from a defendant's wrongful conduct; however, we agree with the district court that "RICO does not shield every injury, nor does it insure against every wrong that can be traced to[, as opposed to "flow from,"] a predicate act." Cullom v. Hibernia Nat'l Bank, 666 F.Supp. 88, 91 (E.D.La.1987) (relying on Sedima, 473 U.S. at 496-97, 105 S.Ct. at 3285-86)
 
 
 [16]
 Regardless of whether we view Cullom's injury as being caused by his discharge, see Cullom, 666 F.Supp. at 90; Diamond v. Reynolds, No. 84-280, slip op. at 6 (D.Del. July 15, 1986), caused by the decision to discharge him, see Nodine, 819 F.2d at 349, or caused by other acts, see Pujol, 829 F.2d at 1205 (refusing to specify the exact acts that caused Pujol's injuries), we agree with the district court that Cullom's injury does not flow from the alleged predicate act