CRUZ *v.* BETO, CORRECTIONS DIRECTOR

No. 71–5552.  Decided March 20, 1972

Per Curiam.

The complaint, alleging a cause of action under 42 U. S. C. § 1983, states that Cruz is a Buddhist, who is in a Texas prison.  While prisoners who are members of other religious sects are allowed to use the prison chapel, Cruz is not.  He shared his Buddhist religious material with other prisoners and, according to the allegations, in retaliation was placed in solitary confinement on a diet of bread and water for two weeks, without access to newspapers, magazines, or other sources of news. He also alleged that he was prohibited from corresponding with his religious advisor in the Buddhist sect.   Those in the isolation unit spend 22 hours a day in total idleness.

Again, according to the allegations, Texas encourages inmates to participate in other religious programs, providing at state expense chaplains of the Catholic, Jewish, and Protestant faiths; providing also at state expense copies of the Jewish and Christian Bibles, and conducting

weekly Sunday school classes and religious services. According to the allegations, points of good merit are given prisoners as a reward for attending orthodox religious services, those points enhancing a prisoner's eligibility for desirable job assignments and early parole consideration.[1] Respondent answered, denying the allegations and moving to dismiss.

---

[1] The amended complaint alleges, *inter alia:*

"Plaintiff is an inmate of the Texas Department of Corrections and is a member of the Buddhist Churches of America. At the time of filing of this suit, he was incarcerated at the Eastham Unit and has since been transferred to the Ellis Unit. There is a substantial number of prisoners in the Texas Department of Corrections who either are adherents of the Buddhist Faith or who wish to explore the gospel of Buddhism; however, the Defendants have refused in the past, and continue to refuse, Buddhists the right to hold religious services or to disseminate the teachings of Buddha. The Plaintiff has been prevented by the Defendants from borrowing or lending Buddhist religious books and materials and has been punished by said Defendants by being placed in solitary confinement on a diet of bread and water for two weeks for sharing his Buddhist religious material with other prisoners.

"Despite repeated requests to Defendants for the use of prison chapel facilities for the purpose of holding Buddhist religious services and the denials thereof the Defendants have promulgated customs and regulations which maintain a religious program within the penal system under which:

"A. Consecrated chaplains of the Protestant, Jewish and Roman Catholic religions at state expense are assigned to various units.

"B. Copies of the Holy Bible (Jewish and Christian) are distributed at state expense free to all prisoners.

"C. Religious services and religious classes for Protestant, Jewish and Roman Catholic adherents are held regularly in chapel facilities erected at state expense for 'non-denominational' purposes.

"D. Records are maintained by Defendants of religious participation by inmates.

"E. Religious participation is encouraged on inmates by the Defendants as necessary steps toward true rehabilitation.

"F. Points of good merit are given to inmates by the Defendants as a reward for religious participation in Protestant, Jewish and

The Federal District Court denied relief without a hearing or any findings, saying the complaint was in an area that should be left "to the sound discretion of prison administration." It went on to say, "Valid disciplinary and security reasons not known to this court may prevent the 'equality' of exercise of religious practices in prison." The Court of Appeals affirmed. 445 F. 2d 801.

Federal courts sit not to supervise prisons but to enforce the constitutional rights of all "persons," including prisoners. We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes "access of prisoners to the courts for the purpose of presenting their complaints." *Johnson* v. *Avery,* 393 U. S. 483, 485; *Ex parte Hull,* 312 U. S. 546, 549. See also *Younger* v. *Gilmore,* 404 U. S. 15, aff'g *Gilmore* v. *Lynch,* 319 F. Supp. 105 (ND Cal.). Moreover, racial segregation, which is unconstitutional outside prisons, is unconstitutional within prisons, save for "the necessities of prison security and discipline." *Lee* v. *Washington,* 390 U. S. 333, 334. Even more closely in point is *Cooper* v. *Pate,* 378 U. S. 546, where we reversed a

---

Roman Catholic faiths which enhance on inmates eligibility for promotions in class, job assignment and parole.

"Because inmates of the Buddhist faith are being denied the right to participate in the religious program made available for Protestant, Jewish and Roman Catholic faiths by the Defendants, Plaintiff and the members of the class he represents are being subjected to an arbitrary and unreasonable exclusion without any lawful justification which invidiously discriminates against them in violation of their constitutional right of religious freedom and denies them equal protection of the laws."

dismissal of a complaint brought under 42 U. S. C. § 1983. We said: "Taking as true the allegations of the complaint, as they must be on a motion to dismiss, the complaint stated a cause of action." *Ibid.* The allegation made by that petitioner was that solely because of his religious beliefs he was denied permission to purchase certain religious publications and denied other privileges enjoyed by other prisoners.

We said in *Conley* v. *Gibson,* 355 U. S. 41, 45–46, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

If Cruz was a Buddhist and if he was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts, then there was palpable discrimination by the State against the Buddhist religion, established 600 B. C., long before the Christian era.[2] The First Amendment, applicable to the States by reason of the Fourteenth Amendment, *Torcaso* v. *Watkins,* 367 U. S. 488, 492–493, prohibits government from making a law "prohibiting the free exercise" of religion. If the allegations of this complaint are assumed to be true, as they must be on the motion to dismiss, Texas has violated the First and Fourteenth Amendments.

The motion for leave to proceed *in forma pauperis*

---

[2] We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

is granted. The petition for certiorari is granted, the judgment is vacated, and the cause remanded for a hearing and appropriate findings.  *So ordered.*

MR. JUSTICE BLACKMUN concurs in the result.

MR. CHIEF JUSTICE BURGER, concurring in the result.

I concur in the result reached even though the allegations of the complaint are on the borderline necessary to compel an evidentiary hearing. Some of the claims alleged are frivolous; others do not present justiciable issues. There cannot possibly be any constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country. At most, Buddhist materials cannot be denied to prisoners if someone offers to supply them.

MR. JUSTICE REHNQUIST, dissenting.

Unlike the Court, I am not persuaded that petitioner's complaint states a claim under the First Amendment, or that if the opinion of the Court of Appeals is vacated the trial court must necessarily conduct a trial upon the complaint.[1]

Under the First Amendment, of course, Texas may neither "establish a religion" nor may it "impair the free exercise" thereof. Petitioner alleges that voluntary services are made available at prison facilities so that Protestants, Catholics, and Jews may attend church services of their choice. None of our prior holdings

---

[1] The Court "remand[s] for a hearing and appropriate findings," *ante,* this page. But, of course, the only procedural vehicle for making such findings in this civil litigation would be the trial to which any civil litigant is entitled, inasmuch as this Court has never dealt with the special procedural problems presented by prisoners' civil suits. See Fed. Rules Civ. Proc.

indicates that such a program on the part of prison officials amounts to the establishment of a religion.

Petitioner is a prisoner serving 15 years for robbery in a Texas penitentiary. He is understandably not as free to practice his religion as if he were outside the prison walls. But there is no intimation in his pleadings that he is being punished for his religious views, as was the case in *Cooper* v. *Pate,* 378 U. S. 546 (1964), where a prisoner was denied the receipt of mail about his religion. *Cooper* presented no question of interference with prison administration of the type that would be involved here in retaining chaplains, scheduling the use of prison facilities, and timing the activities of various prisoners.

None of our holdings under the First Amendment requires that, in addition to being allowed freedom of religious belief, prisoners be allowed freely to evangelize their views among other prisoners. There is no indication in petitioner's complaint that the prison officials have dealt more strictly with his efforts to convert other convicts to Buddhism than with efforts of communicants of other faiths to make similar conversions.

By reason of his status, petitioner is obviously limited in the extent to which he may *practice* his religion. He is assuredly not free to attend the church of his choice outside the prison walls. But the fact that the Texas prison system offers no Buddhist services at this particular prison does not, under the circumstances pleaded in his complaint, demonstrate that his religious freedom is being impaired. Presumably prison officials are not obligated to provide facilities for any particular denominational services within a prison, although once they undertake to provide them for some they must make only such reasonable distinctions as may survive analysis under the Equal Protection Clause.

What petitioner's basic claim amounts to is that because prison facilities are provided for denominational services for religions with more numerous followers, the failure to provide prison facilities for Buddhist services amounts to a denial of the equal protection of the laws. There is no indication from petitioner's complaint how many practicing Buddhists there are in the particular prison facility in which he is incarcerated, nor is there any indication of the demand upon available facilities for other prisoner activities. Neither the decisions of this Court after full argument, nor those summarily reversing the dismissal of a prisoner's civil rights complaint [2] have ever given full consideration to the proper balance to be struck between prisoners' rights and the extensive administrative discretion that must rest with correction officials. I would apply the rule of deference to administrative discretion that has been overwhelmingly accepted in the courts of appeals.[3] Failing that, I would at least hear argument as to what rule should govern.

A long line of decisions by this Court has recognized that the "equal protection of the laws" guaranteed by the Fourteenth Amendment is not to be applied in a precisely equivalent way in the multitudinous fact situa-

---

[2] *Haines* v. *Kerner*, 404 U. S. 519 (1972); *Younger* v. *Gilmore*, 404 U. S. 15 (1971); *Houghton* v. *Shafer*, 392 U. S. 639 (1968); *Lee* v. *Washington*, 390 U. S. 333 (1968); *Cooper* v. *Pate*, 378 U. S. 546 (1964).

[3] *Douglas* v. *Sigler*, 386 F. 2d 684, 688 (CA8 1967); *Carey* v. *Settle*, 351 F. 2d 483 (CA8 1965); *Carswell* v. *Wainwright*, 413 F. 2d 1044 (CA5 1969); *Walker* v. *Pate*, 356 F. 2d 502 (CA7 1966). I do not read *Johnson* v. *Avery*, 393 U. S. 483 (1969), which was concerned with the prisoners' traditional remedy of habeas corpus, to reach the issue of a statutory civil cause of action such as 42 U. S. C. § 1983.

tions that may confront the courts.[4]  On the one hand, we have held that racial classifications are "invidious" and "suspect."[5]  I think it quite consistent with the intent of the framers of the Fourteenth Amendment, many of whom would doubtless be surprised to know that convicts came within its ambit, to treat prisoner claims at the other end of the spectrum from claims of racial discrimination.  Absent a complaint alleging facts showing that the difference in treatment between petitioner and his fellow Buddhists and practitioners of denominations with more numerous adherents could not reasonably be justified under any rational hypothesis, I would leave the matter in the hands of the prison officials.[6]

It has been assumed that the dismissal by the trial court must be treated as proper only if the standard of *Conley* v. *Gibson*, 355 U. S. 41 (1957), would permit the grant of a motion under Fed. Rule Civ. Proc. 12 (b)(6). I would not require the district court to inflexibly apply this general principle to the complaint of every inmate, who is in many respects in a different litigating posture than persons who are unconfined.  The inmate stands to

---

[4] See generally *McGowan* v. *Maryland*, 366 U. S. 420 (1961); *Dandridge* v. *Williams*, 397 U. S. 471 (1970); *F. S. Royster Guano Co.* v. *Virginia*, 253 U. S. 412 (1920); *Levy* v. *Louisiana*, 391 U. S. 68 (1968); *Carrington* v. *Rash*, 380 U. S. 89 (1965), as examples of the spectrum of Fourteenth Amendment review standards.

[5] *Loving* v. *Virginia*, 388 U. S. 1 (1967); *Korematsu* v. *United States*, 323 U. S. 214 (1944).

[6] Petitioner (represented by a lawyer who drafted the complaint) alleged that he was excluded from participation in religious programs and that the exclusion was "arbitrary and unreasonable . . . without any lawful justification."  Holding counsel to standards of pleading applied to other prisoners' claims for relief, conclusions of arbitrariness are insufficient, *e. g.*, *Williams* v. *Dunbar*, 377 F. 2d 505 (CA9 1967); *United States ex rel. Hoge* v. *Bolsinger*, 311 F. 2d 215 (CA3 1962).

gain something and lose nothing from a complaint stating facts that he is ultimately unable to prove.[7]  Though he may be denied legal relief, he will nonetheless have obtained a short sabbatical in the nearest federal courthouse.[8]  To expand the availability of such courtroom appearances by requiring the district court to construe

---

[7] "The last type of writ-writer to be discussed writes writs for economic gain.  This group is comprised of a few unscrupulous manipulators who are interested only in acquiring from other prisoners money, cigarettes, or merchandise purchased in the inmate canteen.  Once they have a 'client's' interest aroused and determine his ability to pay, they must keep him on the 'hook.'  This is commonly done by deliberately misstating the facts of his case so that it appears, at least on the surface, that the inmate is entitled to relief.  The documents drafted for the client cast the writ-writer in the role of a sympathetic protagonist.  After reading them, the inmate is elated that he has found someone able to present his case favorably.  He is willing to pay to maintain the lie that has been created for him."  Larsen, A Prisoner Looks at Writ-Writing, 56 Calif. L. Rev. 343, 348–349 (1968).

"When decisions do not help a writ-writer, he may employ a handful of tricks which damage his image in the state courts.  Some of the not too subtle subterfuges used by a small minority of writ-writers would tax the credulity of any lawyer.  One writ-writer simply made up his own legal citations when he ran short of actual ones.  In one action against the California Adult Authority involving the application of administrative law, one writ-writer used the following citations: *Aesop v. Fables, First Baptist Church v. Sally Stanford, Doda v. One Forty-four Inch Chest,* and *Dogood v. The Planet Earth.*  The references to the volumes and page numbers of the nonexistent publications were equally fantastic, such as 901 *Penal Review,* page 17,240.  To accompany each case, he composed an eloquent decision which, if good law, would make selected acts of the Adult Authority unconstitutional.  In time the 'decisions' freely circulated among other writ-writers, and several gullible ones began citing them also."  *Id.,* at 355.

[8] "[T]emporary relief from prison confinement is always an alluring prospect, and to the hardened criminal the possibility of escape lurks in every excursion beyond prison walls."  *Price* v. *Johnston,* 159 F. 2d 234, 237 (CA9 1947).

every inmate's complaint under the liberal rule of *Conley* v. *Gibson* deprives those courts of the latitude necessary to process this ever-increasing species of complaint.[9]

Finally, a factual hearing should not be imperative on remand if dismissal is appropriate on grounds other than failure to state a claim for relief. It is evident from the record before us that the *in forma pauperis* complaint might well have been dismissed as "frivolous or malicious," under the discretion vested in the trial court by 28 U. S. C. § 1915 (d).[10] This power is not limited or impaired by the strictures of Rule 12 (b). *Fletcher* v. *Young,* 222 F. 2d 222 (CA4 1955). Although the trial court based its dismissal on 12 (b)(6) grounds, this record would support a dismissal as frivolous.

The State's answer to the complaint showed that the identical issues of religious freedoms were litigated by another prisoner from the same institution, claiming the

---

[9] Cf. *Price* v. *Johnston,* 334 U. S. 266, 284–285 (1948), giving to the courts of appeals the necessary discretion to determine when prisoners should be allowed to argue their habeas corpus appeals in person:

"If it is apparent that the request of the prisoner to argue personally reflects something more than a mere desire to be freed temporarily from the confines of the prison, that he is capable of conducting an intelligent and responsible argument, and that his presence in the courtroom may be secured without undue inconvenience or danger, the court would be justified in issuing the writ."

Here, the question is whether prisoners can in every case be permitted to file a complaint, conduct the full range of pretrial discovery, and commence a trial (including presumably trial by jury) at which he and other prisoners will appear as witnesses. The summary reversal effected here encourages such a result without permitting the district courts to exercise the type of discretion permitted in *Price* and without providing any guidance for their accommodation of the special problems of prisoner litigation with a fair determination of such complaints under 42 U. S. C. § 1983 as are rightfully filed.

[10] *Reece* v. *Washington,* 310 F. 2d 139 (CA9 1962); *Conway* v. *Oliver,* 429 F. 2d 1307 (CA9 1970).

same impairment of the practice of the Buddhist religion, which was brought by the attorney employed at the prison to provide legal services for the inmates. It is not clear whether petitioner here was a party to that suit, as he was to many suits filed by his fellow prisoners. If he was, the instant claim may be barred under the doctrine of *res judicata.* In any event, a prior adjudication of the same claim by another prisoner under identical circumstances would be a substantial factor in a decision to dismiss this claim as frivolous.

In addition, the trial court had before it the dismissal of another of petitioner's cases filed shortly before the instant action, where the trial judge had been exposed to myriad previous actions, and found them to be "voluminous, repetitious, duplicitous and in many instances deceitful." [11] Whether petitioner might have raised his claim in these or several other actions in which he joined other prisoner plaintiffs is also proper foundation for a finding that this complaint is "frivolous or malicious." Whatever might be the posture of this constitutional claim if petitioner had never flooded the courts with repetitive and duplicitous claims, and if it had not recently been adjudicated in an identical proceeding, I believe it could be dismissed as frivolous in the case before us.

---

[11] R. 30.