John Edward MABERRY, Plaintiff,

v.

David R. McKUNE, et al., Defendants.

No. 96–3400–JTM.

United States District Court,
D. Kansas.

Nov. 2, 1998.

John Edward Maberry, Lansing, KS, pro se.

James W. Coder, Office of Atty. Gen., Kansas Judicial Center, Topeka, KS, for Defendants.

## MEMORANDUM ORDER

MARTEN, District Judge.

John Maberry is an inmate at the Lansing Correctional Facility (LCF) in Lansing, Kansas. In this pro se civil rights action, brought pursuant to 42 U.S.C. § 1983, Maberry alleges that various Kansas Department of Corrections (KDOC) and LCF employees have infringed upon his constitutional right to exercise his religious beliefs. He further claims equal protection violations, specifically: (1) his religious group is not allowed to worship as often as other groups, and it is required to have outside clergy preside over its weekly meetings; (2) some inmates are allowed to spend more each month for outside items than he is; and (3) prison regulations limit the number and value of books he can possess. Maberry finally claims a due process violation based upon these same book limitations. In his complaint, Maberry seeks declaratory, injunctive, and monetary relief. The defendants have filed an answer and a *Martinez* report.

Defendants seek summary judgment. Maberry has filed a response to the defendants' motion. For the reasons set forth below, the defendants' motion for summary judgment is granted.

### I. Summary Judgment Standards.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the initial showing has been made, the burden shifts to the nonmoving party to designate specific facts

showing there is a genuine issue for trial. *Id.* 477 U.S. at 324, 106 S.Ct. 2548. A party may not rely on the allegations of its pleadings but must establish the existence of a genuine issue of material fact through admissible evidence. *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied,* 516 U.S. 1160, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996). When determining whether there is a material issue of fact, the nonmoving party's evidence is to be believed; all justifiable inferences are to be drawn in its favor; and its nonconclusory version of any disputed issue of fact is assumed to be correct. *Multistate Legal Studies, Inc. v. Harcourt Brace Publications, Inc.,* 63 F.3d 1540, 1545 (10th Cir.1995), *cert. denied,* 516 U.S. 1044, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996).

## II. Facts.

The following factual scenario is based on the defendants' *Martinez* report, the defendants' motion for summary judgment, Maberry's response, and to the extent supported by citations to admissible evidence, the allegations in Maberry's complaint. All reasonable inferences are drawn in Maberry's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where facts are in dispute, the court accepts Maberry's version as true. *Id.*

On April 5, 1993, Maberry submitted a Form 9 Inmate Request to the Chaplain, requesting to be placed on the Wiccan "call-out."[1] On July 9, 1993, Senior Chaplain Craig Scheidecker interviewed Maberry regarding his request for a change of religious preference in his central file. Maberry asked that his previous preference, "none" or "not coded," be changed to his new preference, Wiccan. Maberry again identified himself as a Wiccan on a grievance form filed on March 21, 1994. As of June 7, 1994, Maberry continued to identify himself as a Wiccan, and the officials at LCF regarded and treated him as such.

In late June of 1994, Maberry and other LCF inmates instituted a state habeas corpus action in the Leavenworth County District Court, alleging that their First Amendment right to exercise their religion was being violated because they had been denied the opportunity to practice as followers of the First Hermetic Order of Thelema.[2] Nothing in the record indicates LCF officials had notice of Maberry's association with the Thelemic faith prior to the state habeas corpus lawsuit.[3]

KDOC's Internal Management Policy and Procedure (IMPP) 10–110—Religious Programs—provides for an orderly procedure for inmates to request accommodation for particular religious practices and for the Department to make a determination and response to such requests. Prior to the state proceeding, Maberry had not submitted a formal request for accommodation of his religious practices. On October 7, 1994, four months after he filed his state habeas corpus action, Maberry and Roger Barclift, a fellow inmate and co-petitioner in the state proceeding, submitted the required request form.

After the state habeas proceeding was initiated but before the formal request for accommodation was made, Maberry ordered *Magick in Theory and Practice,* a book written by Aleister Crowley. The book arrived at LCF on August 25, 1994. After reviewing its contents, LCF officials determined it should be censored *in toto.* This decision

---

1. Wicca is a religion that is dedicated to the Earth and the Goddess. *See Wicca: About Wicca* (visited Oct. 14, 1998)<http://www.geocities.com/Athens/Acropolis/5465/about-wicca.html>. Wiccans, also known as witches, worship both a Goddess and a God. *Id.* They practice "magick" or magic, which is the process of causing change through the focusing of one's natural powers. *Id.; see also Wicca: What It Is; What It Isn't* (visited October 14, 1998) <http://www.geocities.com/Athens/3038/wicca.html>.

2. Thelema is a religion founded in 1904 by Aleister Crowley, whom the Thelemites regard as their prophet. The methods and practices employed by Thelemites are numerous and varied, being grouped together under the generalized term, "Magick." Some of the Thelemic practices have been traditionally associated with occultism.

3. Maberry also instituted proceedings in federal court alleging the same basic facts, *Maberry v. McKune, et al.,* Case No. 96–3193–GTV. On May 15, 1996, Judge Van Bebber dismissed the case without prejudice in order to avoid interference with Maberry's state court action and to permit Maberry to fully exhaust his administrative remedies.

was based on the fact that Chapter 12 included a discussion of blood sacrifices. LCF officials were concerned this material could cause a threat to security and could be detrimental to the rehabilitation of inmates. Maberry appealed this decision and officials ultimately decided that Maberry could possess the book, provided Chapter 12 was censored and Maberry agreed to waive any damages claim against the facility on account of the destruction of part of the book.[4]

Once the state habeas action was filed and Maberry had made a formal request for religious accommodation in the Thelemic faith, Gloria Geither, KDOC's manager in charge of volunteer services, began to investigate the existence of Thelema as a religion and to verify what Maberry claimed to be its essential beliefs.[5] After Geither received correspondence from followers of the Thelemic faith, the parties in the state habeas corpus action entered into an agreement concerning LCF's recognition and treatment of the Thelemic religion. This agreement governed during the pendency of the state litigation. As part of the agreement, Geither attempted to obtain a calendar of the Thelemic religion. David Scriven, the U.S. Grand Secretary General of Ordo Templi Orientis,[6] informed Geither such a calendar did not exist; however, he provided her with a list of holy days.

Geither and Chaplain Scheidecker also arranged for a visit from outside Thelemic clergy from the Khensu–Ra–Oasis in Bellevue, Nebraska. During this visit to LCF, two volunteers from Khensu–Ra–Oasis performed a Gnostic Catholic Mass. After the visit, Chaplain Scheidecker sought volunteers from the Khensu–Ra–Oasis and the Ra–Heru–Behutet Camp in Kansas City, Missouri to assist in locating or providing volunteers to aid the spiritual needs of the Thelemic inmates. Chaplain Scheidecker also arranged for weekly call-outs of group study sessions for Thelemites and purchased and distributed copies of the primary religious text to Maberry and others.

As part of his religious accommodation, Maberry seeks over thirty artifacts: stone circle,[7] candles, incense/oils, herbs, chalice, censor, tarot cards, robes, sashes, altar cloth, candle holders, bowl, salt, caldron, pentacle, religious medallion, ring, stones, runes, parchment paper, ink and quill, staff, disks, Book of Shadows, dagger, sword, wand, cords, broom, drum, linen, prayer rugs, altar, lamens, bells, and various religious books. He claims these are all necessary to fully exercise his Thelemic beliefs. He requests a religious diet, apparently vegetarian, and also wants lay practitioners to conduct group rituals and group worship services.

The record indicates none of these items are necessary to exercise the Thelemic faith. Specifically, in a letter dated June 11, 1995, David Scriven of O.T.O. advised Maberry that his list of religious artifacts had marginal, if any, usefulness, to the Thelemic faith. Further, Scriven suggested that the items on Maberry's list were specifically oriented to the Wiccan religion. According to Scriven, the only essential item in the practice of Thelema is *The Holy Books of Thelema*, the

4. Based on this censorship incident, Maberry filed a lawsuit in federal court, alleging violation of his First and Fourteenth Amendment rights as well as the Religious Freedom Restoration Act of 1993 (94–3469–DES). Upon Maberry's request, Judge Saffels dismissed the case without prejudice. Maberry requested the dismissal because of the pending state proceeding. He has resurrected the censorship issue in this case.

In addition to the book censorship, Maberry complains prison officials censored a letter he wrote to David Davis, a fellow inmate, on or about September 14, 1995. Tabor Medill, a KDOC Administrative Assistant, informed Maberry in a September 15, 1995 memorandum that his letter to Davis was being censored because it contained scripted codes.

5. Several months passed before Geither received any responses to her inquiries. During this time,

Maberry filed several grievances, complaining he had not received accommodation of his religious request. Each time Maberry filed a grievance, Warden McKune informed him that Geither was in the process of verifying the existence of the religion and that LCF officials were unable to respond to his request until information was made available to them. Geither also informed Maberry of her efforts.

6. The Ordo Templi Orientis (O.T.O.) is incorporated as a not-for-profit religious organization in California. O.T.O. operates in 17 countries worldwide and has approximately 2,300 active members. It functions as a fraternal, initiatory, social, and educational source for the Thelema religion.

7. Maberry claims that during cleansing rituals there must be a fire within the stone circle.

book LCF has already provided to Maberry. Scriven also stated there is no particular Thelemic diet.

Despite the information from an authority on the Thelemic faith, LCF officials allowed Maberry to use most of his requested items, either individually or in a group worship setting, albeit with some modifications and restrictions. However, the officials fully denied him use of certain items: stone circle; many types of incense, herbs and oils; robes;[8] sashes; a caldron; a dagger (cardboard or otherwise); and a sword. The purpose of the modifications, limitations, and outright denials of certain items was for internal safety and security. As for the vegetarian diet, Chaplain Scheidecker informed Maberry such a diet was available to him, provided he made a Form 9 request to the appropriate official.

Maberry also contends that prison officials treat his religious group different from other religious groups. Followers of Thelema are allowed to practice their religion once a week and only with the assistance of outside clergy. Other religious groups are allowed to practice more frequently and are not required to have outside clergy present.

Finally, Maberry objects to LCF's application of IMPP 11–101 and IMPP 12–120. Specifically, he claims IMPP 11–101 infringes upon his constitutional right to exercise his religion by imposing a $30 per payroll period limit on the use of funds for payments to outside vendors or individuals.[9] Maberry wishes to exceed this limit to purchase religious books. Maberry also claims IMPP 11–101 violates the Ex Post Facto Clause of the Constitution, because it was enacted on January 1, 1996, after he was incarcerated at LCF.

IMPP 11–101 creates a system of earnable offender privileges, designed to provide an effective means of managing the prison population and reinforcing constructive behavioral

changes in offenders. Inmates enter the system with no privileges and work their way through incentive levels.[10] Many privileges may be obtained, including the use of outside funds. Privileges may also be lost. Individual inmates are responsible for their own progression through the level system.

Maberry contends IMPP 12–120 infringes upon his constitutional right to exercise his religion, due process, and equal protection by limiting the number and value of books and other religious materials he can possess. IMPP 12–120 provides a list of property inmates are allowed to possess while in LCF custody. It imposes quantity and value limits on permitted items. Its purpose is to prevent violence and to maintain order and security.

### III. Analysis.

#### A. Religion Claims.

The Supreme Court has established several principles for analyzing prisoners' constitutional claims. First, federal courts must recognize valid constitutional claims of prison inmates. *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Because prisoners retain Constitutional rights, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Id.* (quoting *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). However, "maintaining institutional security and preserving internal discipline are essential goals that may require limitation or retraction of the retained constitutional rights." *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Further, the Supreme Court has recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner,* 482 U.S. at 84, 107 S.Ct.

---

**8.** Apparently the LCF officials offered an accommodation, suggesting Maberry and his fellow Thelemites could acquire colored t-shirts and gym shorts from an outside vendor.

**9.** Maberry also raises an equal protection claim based on IMPP 11–101's $30 spending limit. Inmates who are assigned to minimum wage jobs or those who receive government benefits may be

authorized on an individual basis to exceed the $30 per pay period limit with the Warden's approval. Maberry is not assigned to one of the minimum wage jobs; therefore, he is not eligible to exceed the $30 limit.

**10.** All offenders in custody at the time IMPP 11–101 became effective, including Maberry, were granted Level III privileges.

2254. The Court expounded upon this notion in *Turner:*

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in *Martinez,* additional reason to accord deference to the appropriate prison authorities.

*Id.* 482 U.S. at 84–85, 107 S.Ct. 2254.

■ In *Turner,* the Supreme Court set the standard of review for prison regulations: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* 482 U.S. at 89, 107 S.Ct. 2254. In its decision, the Court established four relevant factors to determine the reasonableness of the regulation at issue. First, a valid, rational connection must exist between the prison regulation and the legitimate governmental interest put forward to justify it. *Id.* Second, the court must ask whether there are alternative means that remain open to prison inmates for exercising their rights. *Id.* 482 U.S. at 90, 107 S.Ct. 2254. Third, the court must consider the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. *Id.* "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. *Id.* However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* 482 U.S. at 91, 107 S.Ct. 2254. Ultimately, courts give great deference to prison administrators in their efforts to preserve internal order and discipline and to maintain institutional security. *Bell,* 441 U.S. at 547, 99 S.Ct. 1861.

■ Applying these principles to the instant case, this court finds the defendants' actions are reasonably related to legitimate penological interests. Not only is Maberry's claim that the defendants have infringed upon his right to exercise his religious beliefs without merit, the record clearly establishes the prison officials have gone out of their way to accommodate his beliefs. Once Maberry filed a formal request for accommodation as a Thelemite, LCF and KDOC officials sought to acquire significant information to aid him in the exercise of his religious beliefs. Gloria Geither of KDOC sent at least seven letters to various Thelemic followers, gathering information about the tenets of the faith, a list of religious holy days, a list of religious texts, and potential dietary restrictions. Geither and Chaplain Scheidecker arranged for a visit from outside Thelemic clergy from the Khensu–Ra–Oasis in Bellevue, Nebraska. Scheidecker also arranged for weekly callouts of group study sessions for Thelemites and purchased and distributed the primary religious text to Maberry and others. Further, Scheidecker contacted both the Khensu–Ra–Oasis in Bellevue, Nebraska, and the Ra–Heru–Behutet Camp in Kansas City, Missouri, seeking assistance in locating or providing volunteers to aid the spiritual needs of the Thelemic inmates at LCF.

In addition to these efforts, LCF officials permitted Maberry, either individually or in a group setting, access to and the use of the majority of the items he requested, notwithstanding the U.S. Grand Secretary's statement they were unnecessary to practice the Thelemic faith. The few items LCF denied, *e.g.,* sword, dagger, clearly pose a threat to prison safety and security. If prison officials allowed Maberry to use these prohibited items, other inmates would want to use them, too, thus creating the "ripple effect" and security problems prison officials may constitutionally prevent. *See Turner,* 482 U.S. at 90, 107 S.Ct. 2254.

Maberry's claim that he was forced to practice the Wiccan religion is unsubstantiat-

ed. Officials treated him as a Wiccan because he formally requested to participate in Wiccan weekly call-outs. He also identified himself as a Wiccan. Until Maberry filed his habeas corpus lawsuit in state court, LCF officials were unaware of Maberry's switch to the Thelemic faith. Any confusion regarding Maberry's religious affiliation has been created by Maberry himself. He claims to be a Thelemite, but the religious artifacts he seeks appear to be associated with the Wiccan faith.[11]

## B. Censorship Claims.

Kansas Administrative Rule 44–12–601(i) provides:

Any incoming or outgoing mail other than legal, official or privileged mail may be inspected at any time. Such mail may be censored only when there is a reasonable belief that:

(1) there is a threat to institutional safety, order, or security;

(2) there is a threat to the safety and security of public officials or the general public; or

(3) the mail is being used in furtherance of illegal activities....

■ LCF's censorship of Chapter 12 of *Magick in Theory and Practice* was justified. The chapter discusses blood sacrifices, a topic that could clearly pose a threat to prison safety and security. LCF's censorship of the inscripted letter from Maberry to his fellow inmate, David Davis, was also justified for the same reason.

## C. Equal Protection/Due Process Claims.

Maberry's equal protection claim is based on three theories. First, Thelemites, as a group, are not allowed to practice as often as other religious groups, and they are required to have outside clergy present during weekly meetings. Second, some inmates are allowed to spend more than $30 per payroll period on outside items. Third, IMPP 12–120 violates his right to equal protection and due process by limiting the number and value of books he can possess.

■ The Supreme Court has held that various religious groups are not required to have identical treatment. *Cruz v. Beto,* 405

U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Instead, prison officials must only ensure that each religious group has a reasonable opportunity to exercise its religious beliefs. *Id.* This standard gives deference to prison administrators to determine which groups will be allowed to exist within the prison population. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). When faced with "the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administration the full latitude of discretion...." *Id.* Nothing in the Constitution requires prison officials to treat all inmate groups alike, particularly when differentiation is necessary to avoid disruption or violence. *Id.*

■ Applying these standards, the court finds no equal protection violation. Every religious group within the prison population need not be treated exactly the same way. Followers of the Thelema religion are allowed weekly group meetings. In addition, Maberry has failed to articulate why lay individuals should lead the group rituals and worship sessions.

■ Maberry also fails to establish an equal protection claim based on IMPP 11–101's $30 spending limit. IMPP 11–101 is an incentive program that seeks to reward those prisoners who are taking responsibility and attempting to become better citizens. Maberry is not at a level that would allow him to seek the Warden's permission to exceed the $30 spending limit. Maberry can aid his own cause by working to achieve higher levels in the incentive program, which in turn would allow his petitioning the Warden to exceed the $30 spending limit.

■ Maberry's claim that IMPP 11–101 violates the Ex Post Facto Clause of the Constitution is also without merit. Although, IMPP 11–101 was enacted after Maberry was incarcerated, it does not constitute an ex post facto violation because it did not affect the legal consequences of Maberry's crime or

11. *See* June 5, 1995 letter from David Scriven to John Maberry.

increase his punishment. *Fristoe v. Thompson*, 144 F.3d 627, 630 (10th Cir.1998).

■ Finally, IMPP 12–120 does not violate Maberry's right to equal protection nor his right to due process. IMPP 12–120 is a regulation that is necessary to achieve the administration's goals of minimizing violence and securing safety within the prison walls. IMPP 12–120 applies to all inmates in LCF custody. Maberry is allowed to possess *The Holy Books of Thelema*, the primary religious text of Thelema.

IT IS ACCORDINGLY ORDERED this 2nd day of November, 1998, that the defendants' motion for summary judgment (Dkt. No. 31) is granted.