**Aldred NEAL, Plaintiff,**

v.

**D.F. LEWIS, et. al, Defendants.**

No. 01–3434–JAR.

United States District Court, D. Kansas.

July 20, 2004.

Aldred Neal, Lansing, KS, pro se.

Matthew W. Ricke, Williams, Gaumer & Rick, LLC, Kingman, KS, Brian D. Sheern, Kansas Attorney General, Rebecca A. Weeks, Topeka, KS, for Defendants.

### MEMORANDUM ORDER AND OPINION GRANTING SUMMARY JUDGMENT

ROBINSON, District Judge.

This matter comes before the Court on the Motion for Summary Judgment (Doc. 52) filed by defendants D.F. Lewis (Correctional Officer), D. Bratton (Unit Team Manager), Michael Nelson (Warden), K. Dutton (Sergeant CSI), J. Spilker (Unit Team Manager), Don Thomas (Deputy Warden of Programs), and William L. Cumming (Secretary of Corrections).

Plaintiff filed this action, *pro se,* seeking injunctive relief and damages pursuant to 42 U.S.C. § 1983. Plaintiff alleges that these defendants, in their "individual and personal" capacities, violated his civil rights, by interfering with his religious observance in violation of the First and Fourteenth Amendments. Plaintiff, a Shiite Muslim, alleges that while he was confined at the El Dorado Correctional Facility defendants: (1) violated his rights to practice his religion and to receive and possess religious materials; (2) denied him due process by denying him a pre-deprivation hearing prior to the seizure and destruction of his books; (3) and violated his rights by providing materials for other faiths but not for Shiite Muslims.

### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[1] The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[2] Essentially, the in-

---

1. Fed.R.Civ.P. 56(c).

2. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

quiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." [3]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. [4] Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. [5] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." [6] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. [7] The court must consider the record in the light most favorable to the nonmoving party. [8]

The Court twice granted plaintiff's requests for an extension of time to respond to the summary judgment motion. The Court granted plaintiff a ninety day exten-sion, to December 30, 2003; and a sixty day extension to February 28, 2004. The Court denied plaintiff's third request, in which he sought another ninety day extension to May 30, 2004. Plaintiff finally filed a response on June 15, 2004, but this response is untimely; as such, the Court has disregarded the response. [9]

Although plaintiff has not timely responded to defendant's motion, this alone does not make summary judgment proper, for plaintiff's burden to respond arises only if the motion is properly supported in the first instance. [10] "Accordingly, summary judgment is appropriate under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c)." [11] If the evidence presented by the moving party does not satisfy this burden, "summary judgment must be denied *even if no opposing evidentiary matter is presented.*" [12] Thus, if a nonmoving party fails to respond to a motion for summary judgment, the court must first examine the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and that the moving party is entitled to judgment as a matter of law. [13]

## II. Uncontroverted Facts [14]

**3.** *Id.* at 251–52, 106 S.Ct. 2505.

**4.** *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**5.** *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

**6.** *Id.*

**7.** *See id.*

**8.** *See Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

**9.** District of Kansas Local Rules provide that a party's failure to file a timely response constitutes a waiver of the right to file a response, except upon a showing of excusable neglect.

*See* D. Kan. R. 7.4. Plaintiff has made no such showing.

**10.** *See Reed v. Bennett,* 312 F.3d 1190, 1195 (10th Cir.2002).

**11.** *Id.* at 1194.

**12.** *Id.*

**13.** *Id.* at 1194–95.

**14.** D. Kan. 56.1(a) provides that "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." By failing to file a response to defen-

Plaintiff Aldred Neal was at all material times, a prisoner housed at the El Dorado Correctional Facility in El Dorado, Kansas. In January 1996, the Kansas Department of Corrections implemented a "Privileges and Incentives Level Program." The purpose of the program was to implement a comprehensive system of earnable offender privileges and provide an effective means of managing the offender population and reinforcing constructive behavior. In order to ensure that the program would be successful, it became necessary to limit family members or friends' ability to purchase items for the prisoner. Kansas Administrative Regulation 44–12–601(q)(1) provides that "all books, newspapers or periodicals shall be purchased through special purchase orders" by incarcerated inmates. The policy has been changed to allow special purchase orders for zero dollars to allow inmates to obtain free books.

The Kansas Department of Corrections has a number of internal management policy and procedures (IMPPs) concerning the operation and management of correctional facilities. These IMPPs include:

(1) IMPP 10–110(VI)(A)(3)(b), which lists legitimate concerns for order or security of the prison as including: (1) Proper utilization of available space; (2) Safety from fire and other physical hazards; (3) Dangerousness of the item, including its potential for use as a weapon; or, (4) The item's value or attractiveness encourages conflicts or theft;

(2) IMPP 12–120, which requires that books sent to a prisoner be sent directly from the publisher or vendor only;

(3) IMPP 12–120, which states that the total number of books allowed in a prisoner's cell is 15; and that these 15 books may include a dictionary, a thesaurus, the primary religious text of a prisoner's faith, and 12 other books chosen by the prisoner;

(4) IMPP 10–110, which lists the Primary text of Islamic religions as the Qur'an;

(5) IMPP 12–120(IX)(B), which lists six different procedures for removing property from prisons that is in violation of prison regulations. These procedures include: (a) Mailing the property to an address of the inmate's choosing at the inmate's expense or, with the approval of the warden, at the facility's expense; (b) Donating the property to a charitable organization; (c) Having the property picked up by an authorized person approved by the warden; (d) Removing and taking the property to a sponsor's address on an approved furlough; (e) Facility staff delivering the property to an address in the locale of the facility, if approved by the warden; (f) If an inmate refuses to designate an approved means of removal, the Warden or designee shall make the designation.

On September 27, 1999, plaintiff was in violation of IMPP 12–120, in that he had more than twelve books in his cell. Defendant Lewis instructed plaintiff to choose the twelve books he wanted to keep in his cell; and advised that the excess books would have to be sent out of the prison. That same date, a "request/authorization to remove personal property" was prepared listing the books which needed to be removed from the Facility and asking plaintiff to determine the method of removal of the books from the Facility. Plaintiff was offered two additional options in addition to the six options available un-

dants' summary judgment motion, "[plaintiff] waived the right to file a response and confesse[d] all facts asserted and properly supported in the motion." *Murray v. City of* *Tahlequah,* 312 F.3d 1196, 1199 (10th Cir. 2002). Thus, to the extent defendants' factual allegations find support in the record, the court has accepted them as true.

der IMPP 12–120(IX)(B): plaintiff could donate the books to the prison; or plaintiff could donate the books to the Facility Chaplain. These two additional options would have allowed plaintiff access to the books in question. Plaintiff, however, refused to designate his choice.

Instead, plaintiff filed a grievance and an appeal concerning the excess books. After the appeal process ended in June 2000, plaintiff still refused to designate a location for the books. On December 22, 2000, more than fifteen months after the books were removed from plaintiff's cell for the IMPP 12–120 violation, and more than six months after the administrative appeal process was completed, the books were finally destroyed.

## III. Discussion

### A. Immunity

■ Although plaintiff's Complaint names defendants in their "personal and individual" capacities, the allegations are all directed at actions defendants took in their official capacity as officer and employees of the Kansas Department of Corrections and El Dorado Correctional Facility. Congress did not intend to abrogate the immunity of states under the Eleventh Amendment when it enacted 42 U.S.C § 1983. Defendants are entitled to absolute immunity for acts performed in their official capacity, for state officials acting in their official capacity are not persons within the meaning of 42 U.S.C. § 1983.[15]

■ Moreover, even if defendants had acted in their personal capacities, qualified immunity shields an individual government official performing discretionary functions from liability for civil damages insofar as his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[16] There is a presumption in favor of immunity for public officials acting in their individual capacities.[17] The defense of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[18] It constitutes "an immunity from suit rather than a mere defense to liability...."[19] Defendants having plead the defense of qualified immunity; plaintiff bears a heavy burden, he must show that defendants' actions violated a constitutional or statutory right and that the right allegedly violated was clearly established at the time of the conduct at issue.[20]

■ Defendants were following established policies and procedures, IMPPs, while removing and disposing of plaintiff's excess materials located inside his cell, and offering him options for disposing of these materials, which were in violation of those policies. Defendants' conduct did not violate a clearly established law. Although plaintiff claims a violation of his rights under the First and Fourteenth Amendments, defendants did not prohibit, preclude or deny his right to practice his religion, in violation of clearly established law. Rather, they followed written practices and procedures in limiting a prisoner to twelve books in his cell at one time, in addition to a primary religious text, a dic-

**15.** See Will v. Mich. Dep't of State Police, 491 U.S. 58, 66–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

**16.** See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**17.** Hidahl v. Gilpin County Dep't. of Social Servs., 938 F.2d 1150, 1155 (10th Cir.1991).

**18.** Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

**19.** Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

**20.** Mick v. Brewer, 76 F.3d 1127, 1134 (10th Cir.1996) (quoting Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir.1995)).

tionary and a thesaurus. Nothing precluded plaintiff from stocking his cell with twelve religious texts in addition to the Qur'an.

In *Wood v. Strickland*, the Supreme Court established a second standard that provides qualified immunity if the official did not act "with a 'malicious intent' to deprive the plaintiff of a constitutional right or to cause him 'other injury.' " [21] The uncontroverted facts do not demonstrate that defendants acted with "malicious intent." On the contrary, defendants offered plaintiff not only the six options for excess books provided for in the IMPP, they offered plaintiff two additional options, either of which would have allowed plaintiff access to the additional books, in the prison library or chaplaincy. It was plaintiff's refusal to choose or designate the option, that resulted in the destruction of the books.

### B. No Violation of First Amendment

█ Plaintiff claims that his First Amendment right to practice religion was infringed by the Kansas Department of Corrections' policy of limiting prisoners to possession of twelve books, plus one dictionary, one thesaurus and the primary religious text for their declared religion. This policy meant that plaintiff was always allowed to possess fourteen books plus the Qur'an, the primary religious text for all Muslims, including Shiite Muslims, plaintiff's professed faith.

█ These policies and regulations limit the number of books a prisoner may possess while in custody. Thus, the policies and regulations impinge on the prisoner's First Amendment rights. Under the Free Exercise Clause of the First Amendment, an inmate must be accorded a reasonable opportunity to pursue his religion.[22] However, what constitutes a reasonable opportunity must be evaluated with reference to legitimate penological objectives of the prison. Consequently, the reasonableness inquiry is less restrictive than what ordinarily might apply.[23] What might be viewed as an unreasonable infringement of a fundamental constitutional right were it to occur outside of prison may be valid in prison as long as the infringement is reasonably related to legitimate penological objectives, which include rehabilitation, deterrence and security.[24] Given a prison's need to constrain antisocial and potentially violent conduct, the latter objective frequently is determinative of accommodation issues.[25] When a prison regulation impinges on inmates' constitutional rights, the regulation is nevertheless valid if it is reasonably related to legitimate penological interests.[26]

This Court has previously found that these various regulations and policies placing quantitative and qualitative restrictions on a prisoner's acquisition, possession and disposition of publications and materials do not violate the Constitution. In *Schlicher v. Smith*,[27] Judge Saffels found that the restriction on the number of books in each cell had its genesis in July 1988, when the Lansing Correctional Facility was cited by the State Fire Marshall's Office during

---

**21.** 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

**22.** *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).

**23.** *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

**24.** *Id.* at 348–49, 107 S.Ct. 2400.

**25.** *See Washington v. Harper*, 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

**26.** *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

**27.** 1994 WL 541755 (D.Kan. September 30, 1994).

inspections. Because of the fire hazard presented by allowing inmates to keep an abundance of combustible material in their cells, the Kansas Department of Corrections was prompted to restrict the amount of materials stored inside of inmates' cells.

In *Maberry v. McKune*,[28] Judge Marten held that application of the policies at issue here, IMPP 11–101 and 12–120, did not violate the First Amendment, nor violate the prisoner's right to equal protection or due process. These policies and regulations, though limiting the number of religious books a prisoner could possess, were necessary restrictions, to achieve the prison administration's goals of minimizing violence and securing safety within prison walls.[29] "Maintaining institutional security and preserving internal discipline are essential goals that may require limitation or retraction of the retained constitutional rights."[30] This Court agrees.

As the Supreme Court stated in *Turner v. Safley*, "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."[31] Running a prison is an inordinately difficult undertaking that requires expertise, planning and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Thus, where a state penal system is involved, federal courts have additional reason to accord deference to the appropriate prison authorities.[32]

This Court has also previously found no constitutional violation in applying another regulation about which plaintiff complains, K.A.R. 44–12–601(q)(1) allowing inmates to receive books, newspapers and periodicals only if received directly from a publisher. In *Zimmerman v. Simmons*,[33] Judge Van Bebber found no constitutional violation in the application of this regulation, noting "[b]y virtue of their convictions, inmates must expect significant restrictions, inherent in prison life, on rights and privileges free citizens take for granted."[34]

The regulation and IMPPs at issue here serve several penological interests. The regulation requiring delivery directly from the publisher, and the policy limiting the number of publications an inmate can possess in his cell, serve the internal security objective of controlling, managing and tracking property in the correctional facility. The regulation requiring inmates to purchase books by special order and to receive delivery directly from the publisher further allows correctional officials to determine the source of publications acquired by the inmate, and the source of funds used to purchase the publication. If an inmate receives or is found in possession of property that he or she did not personally purchase, corrections officials may investigate whether the property was obtained in violation of criminal law or Kansas Department of Corrections regulations against theft, drug dealing, gambling, extortion or dealing or trading with anoth-

---

**28.** 24 F.Supp.2d 1222 (D.Kan.1998).

**29.** *Id.* at 1226.

**30.** *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

**31.** 482 U.S. at 84, 107 S.Ct. 2254, 96 L.Ed.2d 64.

**32.** *Id.* at 89, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64.

**33.** 260 F.Supp.2d 1077 (D.Kan.2003).

**34.** *Id.* at 1082 (citing *McKune v. Lile*, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002)).

er inmate. In addition, this regulation helps foster the privileges and incentives provisions of IMPP 11–101, by encouraging inmates to use their own earned funds to purchase books, which in turn promotes order through positive inmate behavior, such as working and earning funds, and it deters inmates from committing future crimes or rule violations.

Because these regulations and internal policies have a rational basis reasonably related to important penological interests, they do not violate the First Amendment despite impinging on the exercise of First Amendment rights. In addition to being reasonably related to an important government interest, these restrictive policies and regulations are content neutral; they are not directed to religious materials, but to all written publications.[35]

## C. No Due Process Violation

Plaintiff further claims that due process was violated when his excess books were destroyed without a pre-deprivation hearing. But the uncontroverted facts are that defendants applied the IMPP, notifying plaintiff that he could choose among six options for disposition of the excess books. Notably, defendants offered plaintiff two additional options not provided for in the IMPP, either donating the books to the prison library or prison chaplaincy. Either of these options would have given plaintiff access to these books, in the common areas, if not in his cell. The facts establish that there was an adequate procedure be-

fore the books were destroyed. Plaintiff simply failed to avail himself of the procedure, refused to choose an option or options and now complains that defendants destroyed his books some fifteen months after they asked him to designate his choice of disposition. Plaintiff fails to establish any due process violation.

## D. No Denial of Equal Treatment Based on Religion.

▇ Plaintiff also claims that as a Shiite Muslim, he was not given treatment equal to that given prisoners of other faiths, in that the prison library or chaplaincy contains no Shiite Muslim texts. An equal protection violation occurs when the government treats someone differently than another who is similarly situated.[36] Plaintiff must prove "the existence of purposeful discrimination" [37] and that the purposeful discrimination "had a discriminatory effect" on him.[38] Plaintiff has failed this burden of proof.

▇ Moreover, the Supreme Court has held that various religious groups are not required to be treated identically.[39] Instead, prison officials must only ensure that each religious group has a reasonable opportunity to exercise its religious beliefs.[40] This standard gives deference to prison administrators to determine which groups will be allowed to exist within the prison population.[41] Plaintiff does not contend that he was denied an opportunity to practice his religion. Rather, he com-

---

**35.** See *Turner v. Safley*, 482 U.S. at 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64.

**36.** *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir.1996); *Williams v. Meese*, 926 F.2d 994, 998 (10th Cir.1991).

**37.** *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (quoting *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)).

**38.** *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)).

**39.** *Cruz v. Beto*, 405 U.S. at 322 n. 2, 92 S.Ct. 1079.

**40.** *Id.*

**41.** *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

plains that he should be allowed to keep a standing personal library inside his cell to further his religious study. But plaintiff fails to show how he did not receive equal treatment. Whether or not the prison library or chaplaincy had additional Shiite texts, plaintiff was entitled to possess the primary text, the Qur'an, plus twelve other religious texts. IMPP 12–120 was applied to all inmates, not just plaintiff; and it was applied to inmates irrespective of their religion, if any. Like all other prisoners, plaintiff was entitled to possess a total of fifteen books, thirteen of which could be religious texts. This IMPP, as discussed above, is reasonably related to an important penological interest, that is the Department of Correction's goals of minimizing violence and securing safety within the prison walls.

**IT IS THEREFORE ORDERED** that defendants' Motion for Summary Judgment (Doc. 52) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Court's previously granted Temporary Restraining Order and Preliminary Injunction, (Doc. 45) is **PARTIALLY LIFTED and defendants are no longer enjoined from disposing of plaintiff's excess books; however, defendants remain enjoined from disposing of the eight books of English–Arabic Lexicon. Plaintiff will not be allowed to exceed the twelve (total of fifteen) book maximum allowed in his cell.**

**IT IS SO ORDERED.**