Thomas PUGH, Jr., Errol Ennis,
Edward Hamil and Clay
Chatin, Plaintiffs,

v.

Glen GOORD, Commissioner of the
New York State Department of Cor-

rectional Services, William Mazzuca, Superintendent of Fishkill Correctional Facility, Ada Perez, Deputy Superintendent of Programs for Fishkill Correctional Facility, Lewis Goidel, Grievance Supervisor for Fishkill Correctional Facility, Thomas Eagen, Grievance Director of the New York State Department of Correctional Services, and Warith Deen Umar, Administrative Chaplain of the New York State Department of Correctional Services, Defendants.

No. 00 Civ. 7279(GEL).

United States District Court, S.D. New York.

Jan. 3, 2002.

Thomas Pugh, Jr., Errol Ennis, Edward Hamil and Clay Chatin, pro se.

Leonard A. Cohen, New York City, Assistant Attorney General, for Glen Goord, William Mazzuca, Ada Perez, Lewis Goi-

del, Thomas Eagen and Warith Deen Umar.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs Thomas Pugh, Jr., Errol Ennis, Edward Hamil and Clay Chatin bring this action under 42 U.S.C. § 1983, *pro se*, alleging that the defendants, several senior administrators in the New York State Department of Correctional Services ("DOCS") and the Fishkill Correctional Facility ("Fishkill"), violated plaintiffs' First and Fourteenth Amendment rights. The matter is before the Court on plaintiff's motion for a preliminary injunction. For the reasons that follow the motion is denied and the case will be dismissed.

### Background

Plaintiffs are inmates housed in Fishkill, who practice the Shi'a branch of Islam. Affidavit testimony provided in conjunction with the present motion establishes the following essentially undisputed facts. The principal tenets of Islam, regardless of sect, are (1) belief that Allah is God; (2) acceptance that the Qur'an is the book of guidance and contains the words of Allah; (3) acknowledgment of the Prophet Muhammad as the final messenger and Prophet of Allah; (4) acceptance of the "five pillars" of Islam—*Shahada* (declaration of faith), *Salat* (prayer), *Zakat* (Charity), *Saum* (fasting) and *Hajj* (pilgrimage to Mecca); and (5) the practice of *Oiblah*, or praying facing Mecca. (Cohen Aff. Ex. A ¶ 16.) All Muslims apparently accept these principles, whether they are Sunni, Shi'ite, or belong another of the multiple sects that constitute Islam. (*Id.*) The principal difference between Sunnis and Shi'ites is the significance which Shi'ites afford the twelve imams, or religious leaders, who came after the Prophet Muhammad. (Cohen Aff. Ex. A at 4, n. 2.) Shi'ites consider these twelve imams to be the legitimate successors to Muhammad and divine in nature, while Sunnis do not. (*Id.*) According to Pugh, Shi'ites are also forbidden to follow a deceased imam's religious decrees and explanation of religious doctrine, and consequently are only bound by the interpretations of religious doctrine adopted by succeeding Shi'ite religious leaders, or Ayatullahs. (Pugh Aff. ¶ 10 & Ex. B.) Despite their distinct clerical traditions, Shi'a and Sunni religious doctrines remain similar though not identical. (*Id.*)

DOCS has traditionally accommodated religions with significant inmate followings to the greatest extent possible, and Islam is among these religions. (LoConte Aff. ¶ 3, 4.) The DOCS program for Muslim inmates consists principally of a four-point program which is non-sectarian and focuses on elements common to all sects of Islam: (1) *Jum'ah* (Friday noon services); (2) Islamic studies classes; (3) Islamic introduction services; and (4) *Majlis Shu'urah* (consultation and religious planning). (Cohen Aff. ¶ 18.) Additional accommodations include meeting special dietary needs and allowing religious symbols and materials (such as religious publications, prayer rugs and prayer beads). (*Id.* ¶ 19.) Muslim inmates are allowed to pray five times a day, and to observe three Muslim holidays: *Ramadan* (the month of fasting), *Id–Ul–Fitr* (the feast or fast-breaking at the end of *Ramadan*) and *Id–Ul Adha* (the feast of sacrifice). (*Id.* ¶ 19.) During the month of *Ramadan,* there are arrangements that allow inmates to break their fast after sundown, and during the other recognized holidays, Muslim inmates are allowed to have congregate prayer services, communal festivities and family visits. (*Id.*) Most DOCS facilities also have Muslim chaplains on staff to provide religious guidance. (*Id.* ¶ 20.) Inmates may even receive spiritual advice from the outside religious community when a DOCS chaplain cannot fulfil the inmates' spiritual

needs, and outside religious leaders can become spiritual advisors as registered volunteers. (*Id.;* LoConte Aff. ¶ 22.) The DOCS program has been approved of by the Fiqh Council of North America, a nationally recognized board of Muslim scholars and educators, that is recognized as authoritative by all major Muslim organizations in the United States, in which all sects, including Shi'ites, are represented and play leadership roles. (Cohen Aff. Ex. A ¶ 24.)

In addition to these general programs for accommodating religious practices, DOCS has in place provisions for accommodating individualized beliefs of inmates not addressed by the general program of the religious group to which they belong, in a manner consistent with the limitations of the prison setting and resources. (LoConte Aff. ¶ 19). Inmates are allowed to pray and study in their cells, and receive religious publications, so long as the material does not incite violence. (*Id.* ¶ 20.) Furthermore, DOCS accommodates religious dietary needs, including, for example, permitting Muslim inmates to bring food back to their cells in order to break their cycle of fasting during Ramadan. (*Id.* ¶ 24.) [1]

Inmates also have access to a grievance procedures for filing both formal and informal complaints against any religious leader who an inmate believes is arbitrarily denying him access to religious privileges. There is both a facility-based grievance board and a central grievance board based in Albany which respond to formal grievances. (*Id.* ¶ 12 & Ex. A.) Although neither of these boards have the authority to dismiss religious leaders employed by DOCS, they are responsible for working

out disputes between inmates and religious leaders, and bringing any problems to the attention of prison officials who have the authority to take further corrective action. (*Id.*) Where a particular religious leader has been the subject of multiple complaints, the grievance boards contact prison officials, who investigate the matter and may take disciplinary action where appropriate. (*Id.* ¶ 13.) In addition, informal complaints may be lodged with coordinating Chaplain at the particular facility, who also may take the appropriate corrective action. (*Id.* ¶ 15.) Moreover, since adoption of the specific Protocol concerning accommodation of Shi'a adherents, discussed below, it has been specific DOCS policy that Muslim chaplains may be formally disciplined for disparaging Shi'a beliefs. (*Id.* Ex. D.)

Despite the existence of this program, and the associated grievance procedure, plaintiffs allege that the religious program for Muslims impermissibly infringed upon their ability to practice the Shi'a faith. Specifically, plaintiffs allege that when they approached the responsible officials at Fishkill to accommodate their religious beliefs, they were informed that they could teach and practice their faith in the area used by Sunni Muslims, and were directed to spiritual guidance from Imam Muhammad, the Islamic Coordinator for all Muslim inmates at Fishkill, who is a Sunni Muslim. Plaintiffs' request for separate Ramadan services were similarly rebuffed, and they were again directed to contact Imam Muhammad for the appropriate religious services. They have also alleged that a request by the Islamic Guidance Center of Brooklyn, apparently a Shi'a religious organization, to volunteer their

---

1. At the hearing on plaintiffs' motion for a preliminary injunction on October 5, 2001, plaintiffs contended that their ability to celebrate Ramadan would be compromised since Sunnis and Shi'ites break their fasting at different times, and the facility only provided one meal time for Muslims observing *Ramadan*. At that time, LoConte represented that this difference could be accommodated under existing DOCS guidelines.

services to the facility were denied, and that their formal grievances concerning these matters have been summarily dismissed. Finally, plaintiffs allege that Imam Muhammad has exhibited an overt hostility to the Shi'a faith, and that hostility has been evidenced not only in derogatory words, but also in Shi'ite inmates' being denied the right to celebrate *Eid Ghadir Khum,* apparently one of the biggest and most important Shi'a festivities.[2]

The purportedly discriminatory conduct of Imam Muhammad does not appear to have been an isolated incident, and in fact was the basis for a separate litigation in *Cancel v. Goord,* 278 A.D.2d 321, 717 N.Y.S.2d 610 (2d Dep't 2000), *leave to appeal denied,* 96 N.Y.2d 778, 725 N.Y.S.2d 633, 749 N.E.2d 203 (2001). That case was brought in New York State court by another Shi'ite inmate at Fishkill who is not a party to the present action, and involved a similar claim to the one presented here, namely that Imam Muhammad routinely proselytized Shi'ite inmates and denigrated Shi'a beliefs, and did not permit the study of or recognize differences between sects of Islam. The petitioner alleged that as a consequence of Imam Muhammad's supervision, the Muslim program at Fishkill, as then administered, was incompatible with and ultimately antagonistic to the Shi'a faith. The Appellate Division affirmed the lower court ruling that the DOCS treatment of Shi'ite inmates was "arbitrary and capricious" and violated the right to free exercise of religion enshrined in New York's Corrections Law § 610. The Court ordered DOCS to conduct administrative proceedings "to determine the manner in which to best afford Shi'ite inmates separate religious services, under appropriate Shi'a religious leadership, in a time and placed that comport with legitimate penological concerns." *Cancel,* 717 N.Y.S.2d at 612.

In the aftermath of the *Cancel* case, DOCS consulted with numerous Islamic organizations all over New York State to seek appropriate direction in matters of Islamic doctrine, tradition and ritual. (LoConte Aff. ¶¶ 43–44.) As part of the effort to satisfy the Appellate Division's order, on April 19, 2001, senior DOCS officials met with Shayk Fadhel Al–Sahlani, a religious scholar at the Imam Al–Khoei Foundation, the Shi'ite Islamic Center in Jamaica, Queens, that had served as outside ecclesiastical advisor to the plaintiff in the *Cancel* litigation. (*Id.* ¶ 46.) At that meeting they were advised that Shi'ite inmates could worship in the same religious services as Sunni Muslims, but that special care was needed to ensure that Shi'ite inmates were not harassed because of their beliefs. (*Id.* ¶ 47.) Accordingly, in addition to the existing grievance procedures DOCS put in place a Protocol designed to ensure that the rights of Shi'ite inmates are respected and protected. (*Id.* ¶ 48–49.) The new Protocol warns DOCS employees, including chaplains, voluntary chaplains and inmate facilitators to refrain from disparaging inmates on account of their religious beliefs, and mandates that Shi'a Muslim inmates have full access to all Muslim religious education classes, equal opportunities to participate in all Friday *Jum'ah* services, and have at least one member on the Muslim *Majlis* of any facility in which the Shi'ite inmates are present in the general population. (*Id.* Ex. D.) Indeed, the Affidavit of John LoConte, DOCS' Director of Ministerial and

---

**2.** This holiday apparently commemorates the death of one of the original twelve Imams, and it is not a holiday accommodated by the DOCS Muslim program. (Cohen Aff. ¶¶ 11, 29, 30.) Although congregational services are not provided, inmates may observe the holiday individually, and according to Islamic authority relied upon by the defendants, there is no requirement that the holiday be observed in a communal fashion. (*Id.* ¶ 30.)

Family Services, and its supporting exhibits set forth an exceptionally impressive and thorough account of DOCS' religious programs in general and its specific effort to accommodate the religious needs of Shi'ite inmates. The LoConte Affidavit demonstrates that, once alerted to the need to pay particular attention to the distinction between Shi'a and Sunni interpretations of Islam, DOCS undertook a sincere, thoughtful, and effective effort to reconcile the religious needs of the Shi'ite prison population with the security and penological interests of the State.

There is no dispute that neither DOCS nor Fishkill has provided accommodations to Shi'ite inmates in the system, other than those described, and that Shi'ite inmates do not enjoy separate religious services. LoConte has testified that any such procedures would impose a significant administrative burden upon the correctional system. Chief among those burdens are increased security concerns caused by heightened rivalry among prison inmates belonging to different groups with different privileges, and the competition for new members and converts engendered by it. (LoConte Aff. ¶ 29.) LoConte further testified that, while he does not dispute the good faith of Shi'ite inmates, creating separate services for them would increase pressure upon DOCS to recognize other sub-groups that may be used as a subterfuge for gang-related activity. (Id. ¶¶ 38–39.) A proliferation of sects also increases the administrative burdens of supervision, including the need to set aside additional space, increased burdens on prison personnel who must monitor each inmate program, and increased costs. (Id. ¶¶ 28, 30–36.)

### Procedural History

Plaintiffs filed this action in or about July 2000, purportedly as a class action on behalf of themselves and other similarly situated inmates. The complaint did not allege specific facts, but contained only conclusory assertions that plaintiffs were "not able to receive any spiritual guidance in accordance with their religious beliefs" and that they were "being discriminated against by the defendants because of their religious beliefs." (Compl. ¶¶ A, D.) On September 27, 2000, Chief Judge Mukasey issued an order directing the Clerk of the Court to assign a docket number to the complaint, but requiring the plaintiffs to amend their complaint to include detailed allegations of the manner in which their religious freedom was burdened and the alternative means of worship provided by prison authorities that would allow the defendants to mount an intelligent defense. (Cohen Aff. Ex. B at 3.) The Court also stated that the action could not proceed as a class action since pro se plaintiffs cannot act as class representatives. (Id. at 1, n. 1.)

Accordingly, on November 17, 2000, the plaintiffs filed an amended complaint. Plaintiffs seek a total of $500,000 in compensatory damages and injunctive relief requiring the defendants "to provide the Shi'a Muslim inmates at Fishkill Correctional Facility [with] a prayer area to conduct religious classes and services, and to be allow[ed] to receive volunteers, so that they could receive proper spiritual and educational benefit[s] in accordance with their beliefs." (Am. Compl. at 8.)

The parties appeared before this Court on June 7, 2001, for an initial case management conference, with the plaintiffs appearing by telephone. At that time, defendants indicated that plaintiffs' constitutional argument might be mooted by actions taken by the DOCS in response to the recent decision of the Appellate Division of the New York State Supreme Court in Cancel. Defendants stated that, in response to the Cancel case, they had supplemented the existing religious pro-

gram with additional measures designed to secure the First Amendment rights of Shi'ite inmates. Defendants argued, however, that separate services, which plaintiffs demanded, were not constitutionally mandated. In light of the dispute over the requirement for separate services, this Court directed the parties to proceed to discovery, and scheduled a second conference on October 5, 2001, to check on the progress made.

On August 13, 2001, plaintiffs filed a motion for a preliminary injunction, challenging the adequacy of the accommodations put into place by the DOCS, and seeking an injunction requiring defendants to establish a separate religious program for Shi'ite inmates. This motion is now fully briefed and ripe for resolution.

## *Discussion*

■ "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (emphasis in original) (quoting from CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, 11A FEDERAL PRACTICE AND PROCEDURE § 2948 (2d Ed.1995)). A preliminary injunction may only be granted where the plaintiff has shown that (1) that the injunction is necessary to prevent irreparable harm, and (2) there is either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of the claim and a balance of hardships that tips decidedly in favor of the moving party. *Otokoyama Co. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir.1999). There is no serious dispute that plaintiffs have successfully made a showing of irreparable harm.[3] Nevertheless, plaintiffs' request for a preliminary injunction fails because they cannot establish a likelihood of success on the merits. Indeed, a careful examination of the merits of plaintiffs' claims reveals that plaintiffs have not stated a claim on which relief can be granted, and that their complaint accordingly must be dismissed.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Thus, inmates retain the right to the free exercise of religion protected by the First Amendment. *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). However, the constitutional protections afforded to prison inmates are not absolute, and indeed are

---

**3.** There is some dispute in this Circuit about whether an alleged loss of First Amendment rights is presumed to constitute irreparable harm. *See Amandola v. Town of Babylon,* 251 F.3d 339, 343 (2d Cir.2001) ("We must perforce acknowledge that this Court has not spoken with a single voice on the issue of whether irreparable harm may be presumed with respect to complaints alleging the abridgement of First Amendment rights.") Defendants assert that assuming such a presumption exists, plaintiffs cannot benefit from it because they have failed to make a *prima facie* showing that the DOCS Muslim program prohibits observance of a central tenet of their religion. (Def. Mem. at 11. n. 2.) As discussed in further detail below, the crux of the plaintiffs' claims is not that the DOCS program violates the First and Fourteenth Amendment on its face. Rather, plaintiffs argue that the DOCS program, as administered by an openly hostile Sunni chaplain, fails to protect their constitutional rights. Under this theory, to the extent that plaintiffs have properly alleged an infringement of free exercise rights that cannot be regarded as speculative, they have made a satisfactory showing of irreparable harm, regardless of whether the presumption exists and applies here. *Cf. Latino Officers Assoc. v. Safir,* 170 F.3d 167, 171 (2d Cir.1999) ("[T]his kind of conjectural chill is not sufficient to establish real and imminent irreparable harm.")

scrutinized under a standard that is less exacting than that ordinarily applied to constitutional infringements. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Assessing a free exercise claim by inmates involves determining.

(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held, (2) whether the challenged practice of prison officials infringes upon the religious belief, and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest.

*Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.1988). Inmates adhering to minority religions are also protected under the Equal Protection Clause of the Fourteenth Amendment, *Cruz*, 405 U.S. at 321–22, 92 S.Ct. 1079, and whether or not prison regulations violate the Equal Protection Clause similarly depends on whether the regulation is "reasonably related to legitimate penological interests." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.1990). Thus, under both the First and Fourteenth Amendments, prison regulations that restrict the exercise of religious beliefs are subject to a "reasonableness" standard, applied in relation to legitimate state penological interests.

This standard gives considerable deference to the judgment of prison officials who are in the best position to make difficult decisions involving prison administration. *Turner*, 482 U.S. at 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). "Subjecting the day to day judgment of prison officials to an inflexible strict scrutiny analysis would severely hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* at 89, 107 S.Ct. 2254. Under this standard, a prisoner "is not entitled to insist on a religious advisor whose beliefs are completely congruent with his." *Muhammad,* 904 F.Supp. at 190. Nor must prison officials provide a place of religious worship for every faith, regardless of size, as long as all prisoners have a reasonable opportunity to exercise their faith. *Cruz*, 405 U.S. at 322, n. 2, 92 S.Ct. 1079. Rather the distinction between permissible and impermissible restrictions is determined by a balancing test which looks to (1) whether there is a rational relationship between the regulation and the legitimate governmental interest asserted; (2) whether the inmates have alternative means to exercise that right; (3) the impact the accommodation will have on the prison system; and (4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254.

Defendants do not contest that the practices asserted by the plaintiffs are within their scheme of belief or that these beliefs are sincerely held by the plaintiffs. Nor is there any doubt that plaintiffs have alleged limitations on their ability to practice their religious beliefs. Plaintiffs' primary claims of infringements on their religious practice, however, do not make out a supportable claim that the DOCS' Muslim program is unconstitutional on its face. It is undisputed that no ecclesiastical authority or religious text requires separate services for Shi'ites and Sunnis. Nor do the plaintiffs dispute that the four-point program for Muslim inmates is facially nonsectarian, and permits practice of those aspects of Islam that are common to both the Shi'a and Sunni faiths. Prisoners are permitted to pray five times daily, to participate in religious consultation and instruction, to ·take part in communal *Jum'ah* services and to possess and use religious symbols such as prayer rugs and prayer beads. In light of these significant accommodations, plaintiffs do not appear to contest that, at least in theory, Shi'ite

inmates are afforded a meaningful opportunity to observe those traditions, rituals and beliefs that are required of them by their religious doctrine.[4] Prior cases, moreover, have consistently rejected the claim that the Constitution requires separate religious services or chaplains for different Islamic subgroups. *See Matiyn v. Commissioner*, 726 F.Supp. 42 (W.D.N.Y. 1989) (Sunni Muslims not entitled to prayer services separate from Shi'a adherents); *Muhammad v. City of New York*, 904 F.Supp. 161 (S.D.N.Y.1995) (Nation of Islam adherents not entitled to services and chaplain separate from other Islamic sects).

■ For the most part, then, plaintiffs do not directly attack the religious accommodations governing Muslim inmates, and thus essentially concede that regulations themselves do not infringe upon their First and Fourteenth Amendment rights. Rather, plaintiffs assert that regardless of whether the DOCS Muslim program passes constitutional muster on its face, the program as administered under the Sunni chaplain at Fishkill significantly infringes upon their ability to worship freely.[5] Plaintiffs have alleged that Imam Muhammad has shown overt bigotry against Shi'a Muslims by openly proselytizing and denigrating Shi'ites in front of Sunni in-

mates. Taking that allegation to be true, as we must at this stage of the litigation, throws the alleged constitutional deprivations in a different light. While the Muslim program in the abstract undoubtedly passes muster, plaintiffs argue (with some force) that the program as administered effectively deprives Shi'ite inmates of their free exercise rights. While the First and Fourteenth Amendments do not require that prison inmates have access to religious advisors whose own views are completely congruent to their own, their protections are certainly not satisfied where the religious leader purportedly responsible for inmates' spiritual guidance overtly despises the deeply held beliefs of inmates under his charge. Indeed, as courts have observed in analogous contexts,

> [W]hen the only option available for a prisoner is under the guidance of someone whose beliefs are different from or obnoxious to his, the prisoner has effectively been denied the opportunity for group worship and the result may amount to a substantial burden on the exercise of his religion.

*Muhammad*, 904 F.Supp. at 191, n. 39 (citation omitted). Accordingly, plaintiffs have successfully stated the second element of their claim. Therefore, the essential dispute in this lawsuit is whether the

---

**4.** The one exception is the absence of any accommodation to permit Shi'ite inmates to participate in congregational services during a holiday of particular importance to Shi'ites, *Eid Ghadir Khum*. However, the plaintiffs have nowhere alleged that their beliefs require *congregate* worship on this holiday, and defendants have stated that the plaintiffs are *individually* free to celebrate that holiday. (Cohen Aff. Ex. A ¶ 30.) Because the plaintiffs have not been prohibited from observing any religious practice mandated by their faith, this purported deprivation does not rise to the level of a First Amendment infringement.

**5.** Prison policies that target certain religious beliefs are also unconstitutional. *See United*

*States v. Amer*, 110 F.3d 873, 879 (2d Cir. 1997). Although plaintiffs' original complaint contained conclusory allegations that the defendants intentionally discriminated against them, Chief Judge Mukasey dismissed plaintiffs' claim of intentional discrimination under 28 U.S.C. § 1915(e)(2), but allowed amendment of the complaint to contain specific factual allegations supporting intentional discrimination. (Cohen Aff. Ex. B. at 6.) Plaintiffs' amended complaint contains conclusory allegations of intentional discrimination that are indistinguishable from those in the original complaint, and therefore subject to dismissal for the same reason.

measures taken by the defendants to address this problem are "reasonable," or whether further action, including establishing separate services for Shi'a and Sunni inmates, is constitutionally required.

■ In response to essentially identical allegations in the state court litigation, however, DOCS in August 2001 put into place a Protocol designed to ensure that the rights of Shi'ite inmates are respected and protected. The new Protocol (LoConte Aff. Ex. D) warns DOCS employees, including chaplains, voluntary chaplains and inmate facilitators, to refrain from disparaging inmates on account of their religious beliefs, and mandates that Shi'a Muslim inmates have full access to all Muslim religious education classes, equal opportunities to participate in all Friday *Jum'ah* services, and at least one member on the Muslim *Majlis* of any facility in which the Shi'ite inmates are present in the general population. In addition, inmates are accorded access to both formal and informal grievance procedures by which to seek redress. Whether these measures are reasonable turns an application of the *Turner* factors.

At the outset, it must be noted that to the extent plaintiffs claim that defendants should be required to take action to discipline or control Imam Muhammad, such claims must be dismissed pursuant to 42 U.S.C. § 1997e(a). That statute requires prisoners to exhaust all available administrative remedies before bringing a § 1983 claim with respect to "prison conditions." Complaints regarding deprivations of First Amendment rights pertain to prison conditions and are subject to this exhaustion requirement. *See, e.g., Majid v. Wilhelm,* 110 F.Supp.2d 251, 256 (S.D.N.Y.2000). Here, plaintiffs have never availed themselves of the grievance procedure for complaints against prison employees with respect to the central allegation in their complaint. Although the complaint in this action states that the plaintiffs filed at least three grievances with prison officials in an attempt to secure separate religious services for Shi'ite inmates, the plaintiffs have never used the grievance procedures available to redress the purported conduct of Imam Muhammad, which is at the heart of the present lawsuit. The new protocol for dealing with Shi'a practice in the prisons specifically provides remedies for such conduct by chaplains as plaintiffs allege (LoConte Aff. Ex. D. Article I), supplementing those available at the time plaintiffs filed this lawsuit. Under the statute, plaintiffs are required to exhaust these administrative remedies, and doing so might well provide them more immediate relief than litigation in this Court.

At any rate, on the merits, plaintiffs cannot establish that the defendants' refusal to establish separate services was unreasonable even given the allegations about Imam Muhammad's actions. Applying the *Turner* factors, I conclude that the constitution does not require more than is provided by DOCS' Muslim program, as modified by the new Shi'a protocol, and that plaintiffs accordingly cannot succeed on the merits of their claims.

First, defendants have undoubtedly articulated a rational relationship between their refusal to provide separate services to Shi'ite inmates and their interest in limiting the administrative burdens placed on the prison system. Affidavit testimony from prison officials charged with making the appropriate administrative decisions plainly establishes that requiring separate services for every religious subsect would stretch prison resources because of the added space, personnel and money that would be required to provide for additional congregations of prison inmates in a manner consistent with prison security. As the Supreme Court has instructed, federal courts should not second-guess prison offi-

cials' considered judgments on matters of prison administration. *Turner,* 482 U.S. at 84–85, 107 S.Ct. 2254.

Second, as set forth above, the Muslim program provides more than adequate opportunities for plaintiffs to worship in a manner that is both meaningful and consistent with their faith. Any deprivation of free exercise rights alleged by the plaintiffs results solely from the allegedly hostile and bigoted conduct of the Muslim chaplain at Fishkill charged with administering the Muslim program and providing spiritual guidance to all Muslim inmates. The recent Protocol, however, specifically prohibits such conduct, and provides Shi'ite inmates additional ground to avail themselves of the existing grievance procedures established by DOCS to prevent abusive and derogatory conduct on the part of prison chaplains. Significantly, at the hearing on the preliminary injunction, plaintiffs did not allege any recent incidents or renewed violations by Imam Muhammad since the adoption of the Protocol. Thus, plaintiffs are provided substantial means of observing the rituals and traditions required by their faith, ensured access to all religious privileges enjoyed by other Muslim inmates, and provided with a grievance mechanism to remedy any violations by the Muslim chaplain. To the extent that they object to the conduct of Imam Muhammad, their remedy, as already noted, is via the administrative grievance procedure and does not require institution of separate religious services for Shi'ites.

Third, prison officials have documented that multiplying the number of sects or groupings entitled to separate services would have an adverse impact upon security at prison facilities by increasing opportunities for inmates to exchange contraband and carry on gang-related activity under the cloak of religion. This Court's consideration of the prison's legitimate concerns about gang-related activity should in no way be seen as a rejection of the sincerity of the plaintiffs' religious beliefs. Accepting that the plaintiffs are observant and deeply religious Muslims—something this Court has no reason to doubt—to require separate services for Shi'ite inmates would raise problems that threaten the security of both prison inmates and prison staff. This concern is even more compelling in light of the numerous accommodations that DOCS has already made for religious adherents in general, and Muslim inmates in particular. The Protocol, which the record establishes was devised in close consultation with recognized Shi'a religious authorities, does not provide for separate services as a requirement of Shi'a observance.[6] Distaste for the particular chaplain at Fishkill on the part of Shi'ite inmates there does not alter the appropriate balance of concerns regarding the need for separate services.

Fourth, there are no readily available alternatives that would be any more effective in securing their rights and reconciling them with the prison's legitimate interests. The only remedy suggested by the plaintiffs, as mentioned above, would require significant additional commitments of prison resources and would, moreover, raise substantial security concerns—an

---

**6.** Plaintiff Pugh argues that the decision of Shaykh Al Sahlani, of the Al Khoei Islamic Center, "to sanction the State protocol is incorrect and is against the ruling of the Ayatullahs." (Pugh Aff. ¶¶ 9–10.) It is not for this Court to adjudicate differences of opinion regarding Shi'a doctrine. DOCS has made every appropriate effort to seek counsel from appropriate and recognized Shi'a religious authorities in an effort to determine what is and is not required for Shi'ite inmates to practice their religion. The Constitution does not require prison officials to accommodate particular inmates' views concerning the orthodoxy of those authorities' recommendations.

outcome that the constitution does not require. The absence of ready, and easily implementable, alternatives to the measures already taken by prison officials is persuasive circumstantial evidence that the measures taken here were reasonable. *See Turner*, 482 U.S. at 90, 107 S.Ct. 2254.

These conclusions compel not only the denial of a preliminary injunction, but dismissal of the plaintiffs' claims. Although this action is presently before the Court on plaintiffs' motion for a preliminary injunction, plaintiffs essentially requested the primary remedy demanded in their complaint—the establishment of separate services for Shi'ite inmates. That motion effectively sought to establish that the Protocol established by the defendants was constitutionally inadequate, and the parties each introduced evidence establishing the practices required of inmates following the Shi'a faith and the practices followed by prison authorities in accommodating those practices. Thus, resolution of the motion has effectively resolved the dispute at hand. Further discovery will not aid in resolution of this matter. Plaintiffs do not dispute that all Islamic sects share certain central religious practices, and that these shared religious practices are accommodated under the DOCS program. Nor do they dispute the measures taken by the defendants to address the alleged conduct of Fishkill's Muslim Chaplain. Defendants have presented affidavit testimony setting forth the administrative and other burdens that would result from a requirement of separate services. The only dispute remaining is a purely legal one concerning whether the measures actually taken by the defendants are constitutionally sufficient. The analysis set for above indicates that they are, and plaintiffs' claims must be dismissed.

### Conclusion

For the foregoing reasons, plaintiffs motion for a preliminary injunction is denied and plaintiffs' claims are dismissed in their entirety.

SO ORDERED: